Argued and submitted June 21, affirmed December 11, 1996

In the Matter of the Marriage of

Mary Lockhart SCHNEBLY,
*Respondent,*

*and*

Jon David SCHNEBLY,
*Appellant.*

(15-95-01655; CA A90740)

930 P2d 225

Inge D. Wells argued the cause for appellant. With her on the brief was Hutchinson, Anderson, Cox & Coons, P.C.

Marc D. Perrin argued the cause for respondent. With him on the brief was Joseph & Perrin, P.C.

Before Deits, Presiding Judge, and Richardson, Chief Judge, and Haselton, Judge.

HASELTON, J.

**HASELTON, J.**

In this appeal from a dissolution judgment, husband assigns error to the trial court's award of spousal support. The trial court awarded spousal support to wife of $1,000 per month for four years, $750 per month for two years, and $500 a month for two more years. We review *de novo*, ORS 19.125(3), and affirm.

The parties were married for 13 years and had lived together for about 18 months before their marriage. There are no children. At the time of trial, husband was 36 years old; wife's fortieth birthday was two weeks after the trial. When the parties were first married, wife was finishing her masters degree in counseling at Oregon State University and working as a teaching assistant. Husband was a student in pharmacy. After receiving her degree in 1981, wife worked at the university financial aid office as an assistant grant specialist, earning between $500 and $600 a month.

After husband graduated in 1983, he took a job as a staff pharmacist at Sacred Heart Hospital in Eugene at a salary of $15 an hour. When he left the position in August 1991, he was earning $23 an hour. Shortly after husband began working at Sacred Heart, the parties moved from Corvallis to Eugene, where wife did research work on a part-time basis. She did not seek full-time employment and testified that her part-time work enabled her to spend time with husband who, at first, worked eight nights followed by six nights off. In 1990, wife decided to pursue a doctorate degree in the field of public health, a decision supported by husband.

In August 1991, husband took a position as Director of Pharmacy for Douglas Community Hospital in Roseburg at a salary of $45,000 a year. The hospital was one of 13 owned by Health Trust Hospital Company, Inc., in the western United States. While there, husband was involved with a pharmacy advisory committee for Health Trust and did consulting work for Health Trust on pharmacy operations. He instituted cost-savings techniques at the hospital that saved Health Trust about $250,000 and made recommendations as to how a pharmacy at another facility could cut costs. By 1993, his salary had increased to $55,488.

At the time husband took the Roseburg position, wife was "in the middle of" her Ph.D. program at the University of Oregon. Wife was not enthusiastic about moving to Roseburg but agreed to do so with the understanding that the move would be for a short period of time and that, to enhance her employment opportunities, the couple's next move would be to a community with a university. For the first two academic terms after the move to Roseburg, wife rented an apartment in Eugene because of her full-time class load and the work demanded by her assistantship. Thereafter, she commuted to Eugene from Roseburg until she finished her degree in 1993, graduating with almost a 4.0 grade average. After graduating, wife applied for two post-doctoral positions, both of which would have required relocating. She was turned down for both positions.

In July 1993, while in Roseburg, husband began studying for a masters degree in health care administration from the University of Colorado. He did four weeks of classroom training in Denver and the remainder by computer. He pursued the program in order to learn more about hospital administration in order to give himself "more choices" in his career. The administrative component supplemented his clinical knowledge of health care.

In the spring of 1994, husband began looking for a new job, and, in May, the parties went to Tennessee to look at a position that husband was considering. Husband indicated to wife that it was important to him that she be "happy" with where they moved, and wife inquired about universities and colleges in the area. About two months after returning from Tennessee, the parties separated. In September, husband was hired as Materials Coordinator for Health Trust and moved to Salt Lake City. In April 1995, Health Trust merged with Columbia HCA Healthcare Corporation. Husband continued to hold the same position but testified that the position was somewhat vulnerable, because the person who had recruited him and had acted as his mentor had recently resigned. Husband's base salary with Columbia was $74,463. In addition, he received a bonus in May of $8,750. His employment benefits include medical and dental insurance, at a cost to him of $17.79 a month, life insurance, a 401(k)

retirement plan and reimbursement for travel and entertainment expenses.

Husband testified that his immediate career goals are to take a position as a chief operating officer or chief clinical officer for a hospital, which he hoped to do within a year or two after trial. Testimony from a career counselor called by wife was that a masters degree in health care administration is "the most highly-sought degree for the top executives for both hospitals and health care corporations" and has a base salary range from $50,000 to $300,000. Husband has outstanding student loans of approximately $28,000.

Wife testified that she hopes to pursue the teaching and research career for which she has prepared but has not found employment. She has returned to Eugene where she has worked in grant-funded positions of limited duration. She testified that she has worked between 60 to 70 hours a week, some of which was unpaid work seeking grant funding. She earns about $1,700 a month and receives about $400 a month from a family trust. She has no significant benefits from her employments. She rents a room from a friend for $200 per month and testified that she would have to pay about $250 a month to continue her health insurance through husband's employer. She has no debts from the marriage.

The trial court awarded spousal support to wife of $1,000 a month for four years, $750 a month for two years, and $500 a month for two more years. Husband assigns that award as error. The primary focus of husband's argument is ORS 107.105(1)(d)(F), which provides that, in awarding spousal support, the court is to consider

> "[t]he extent to which the present and future earning capacity of a party is impaired due to the party's extended absence from the job market to perform the role of homemaker, * * * where it is likely that the party will never substantially recover from the loss of economic position due to the extended absence, and where the other party has, during the marriage, achieved a substantially advantageous economic position through the joint efforts of the parties[.]"

Husband argues that wife's earning capacity is not impaired due to an absence from the job market occasioned by her role

as a "homemaker." Rather, husband contends, "wife chose to work part-time, despite the fact that the parties had no children, and she was not needed as a mother and homemaker." He argues that her earning capacity is due to the "respective *choices* regarding careers" (emphasis husband's) that the parties made and that wife's current unfavorable career position is the result of her "decision not to pursue a PhD until 1990." He summarizes:

> "Throughout the parties' marriage, Wife has had the good fortune to be able to do what she chose, and to pursue a career change at an age when many people are constrained by the need to support their children from returning to school. If this court accepts Wife's argument that she has been economically disadvantaged, that disadvantage arises out of her career change, and not out of her role in this marriage. To hold otherwise means to accept the premise that any woman entering a marriage is inherently in a subordinate position and at an economic disadvantage, regardless of the circumstances."

■■ Husband's argument that wife does not come within ORS 107.105(1)(d)(F) because she was not "needed" as a "homemaker" misses the mark. That argument assumes that a wife's economic position at the end of a marriage can be assessed only in relation to the effect a "traditional" homemaking role has had on that economic position. That assumption is not correct. Where, as here, wife has not been absent from the job market for an extended period, and has, in fact, been both employed and preparing for the job market throughout the marriage, ORS 107.105(1)(d)(F) is immaterial.

We also reject husband's argument that, because wife did what she wanted, the consequence of her "good fortune" is that wife is stuck with whatever earning capacity that choice yields, regardless of any other circumstances attending the marriage, including those listed in the statute. That proposition does not square with the evidence here, which shows that the career choices—and the life-style attendant upon those choices—were mutual. That is, wife did not unilaterally withdraw from the full-time job market to pursue her Ph.D. over husband's objections. Rather, as husband acknowledges in his brief, he supported wife in pursuing a

Ph.D. and "did not object to wife's working part-time." Wife, in turn, supported husband's career move to Roseburg,[1] a move that placed husband in a position with Health Trust that, with the addition of his graduate degree, enabled him to significantly advance his career. We agree with the trial court's finding that both parties contributed to each other's earning capacities. We also agree with the court's finding that wife delayed her career in support of husband's pursuit of his.[2]

■      Husband, argues, however, that the possible delay in wife's career caused by the move to Roseburg and the couple's separation and divorce justifies support of no more than $750 a month for two years, and that, even considering the other statutory factors set out in ORS 107.105(1)(d), there is no basis for a larger award. Such a month-for-month, tit-for-tat "time loss" approach to spousal support is, however, artificially narrow and does not comport with these parties' reality. Rather, the objective in fixing spousal support is to determine the support that is "just and equitable," recognizing the parties' needs, the ability to pay, and the statutory objective of ending the support dependency relationship within a reasonable time. *See Ley and Ley*, 133 Or App 138, 143, 890 P2d 440 (1995). Those broader considerations compel affirmance of the trial court's award in this case.

ORS 107.105(1)(d)(D) provides that, in determining an award of spousal support, the court is to consider

"[t]he earning capacity of *each* party, including educational background, training, employment skills and work experience[.]" (Emphasis supplied.)

The evidence here is that, with husband's support, wife prepared for a teaching and research career in post-secondary education. That career was not available in Roseburg, and, following the separation, she has not found that employment.

[1] Both parties appeared to be willing to accommodate any relocations that the other's career might have required if wife had been admitted to a post-doctoral program or husband had taken employment in Tennessee.

[2] As the trial court noted:

"Certainly Roseburg is not a location that anyone would normally choose if you were going to pursue a career at a research institution such as the University of Oregon or other major research institution of higher learning."

She testified that an academic career requires publications and that her employment since the separation has not left her the necessary time for the research needed to publish. She has worked to build her resume by taking jobs that she testified would enhance her degree. She was not aware of any current academic openings, but had made inquiries into several positions, and attended conferences where she took advantage of "every job interview opportunity that those conferences present[ed]."

Husband argues that wife could find other employment, given her education and experience. However, the evidence was that wife's best chances for employment were in pursuing the path the parties mutually agreed on during their marriage—that is, in teaching and, especially, research. Husband's witness, Areta Sturges, a vocational rehabilitation consultant and vocational counselor testified:

"Q. [by wife's counsel]:   In these five categories you have [identified as ones for which wife has qualifications], do any one of these five stand out as being a category that [wife's] Ph.D. best suits her for?

"* * * * *

"A.   Again, it would be, definitely the research and the teaching would be the two I would say that degree would lend itself most to.

"Q.   Research and post-secondary education?

"A.   Yes.

"Q.   If you throw her experience into the mix, which of these five areas do you think are her best shots in terms of employment?

"A.   If we look outside Oregon, I would say research."

Sturges also testified that wife was not "currently qualified as an associate professor or as a full professor," but was qualified for a position of teaching assistant, research assistant or assistant professor. Sturges' report shows that, in Oregon, the average salary for a teaching assistant is $17,272, the average salary for an assistant professor is $37,103 and, for a research assistant is $28,000. Sturges was not aware of any available teaching assistant positions, and

the market for research positions was "marginal." She also testified that, with post-secondary education positions, a person would be likely to start at a low salary, and that it would take from five to eight years to get to the average level of income "depending upon a person's performance and their publications."

Husband's earning capacity, reached during the marriage, is in excess of $80,000. His testimony was that he hoped to make a job change within two years which, according to expert testimony, has a top salary range of $300,000. Husband argues, however, that support is not intended to put both spouses on an equal financial footing and that wife's expenses are only $1,015 a month. Therefore, husband argues, "[e]ven assuming an increase in her eventual housing costs, the $750 per month spousal support proposed by husband more than meets her needs, based upon her present earning capacity."[3]

■    Husband is correct that the purpose of support is not to equalize income. However, under ORS 107.105(1)(d)(K), determining support includes considering the "standard of living established during the marriage." Here, the parties had a "comfortable" lifestyle, which included owning their own homes and vacationing. The evidence shows that wife's present earning capacity cannot approach that standard of living. She also is not even at the beginning of the five to eight years that Sturges testified would be necessary to reach the "average" income in the career for which she prepared with husband's acquiescence.[4] The step-down award of support recognizes wife's ability to be self-supporting within a "just

---

[3] We note that, even if wife obtained employment in counseling or research as husband has argued that she could, the record shows beginning salaries for those positions around $20,000, comparable to wife's current income.

[4] The trial court recognized that reality:

"In academia, as has been testified to here, the wife does need some time to develop her resume in order to obtain an academic position and it will take her a period of time to obtain such a position and obviously, at least as one witness testified, five to eight years to achieve the average salary for those positions and the stability we all know that is produced by becoming an associate professor at an institute of higher education which qualifies one for various aspects of tenure."

and equitable" period of time, considering the standard of living enjoyed during the marriage. We will not disturb that award.

Affirmed. Costs, not including attorney fees, to wife.