Argued and submitted October 20, 2003, affirmed September 1, 2004

In the Matter of the Marriage of

Daryl James KOLLMAN,
*Appellant,*
*and*

Marta Carpenter KOLLMAN,
*Respondent.*

9904909CV; A118258

96 P3d 884

George W. Kelly argued the cause and filed the briefs for appellant.

Eric C. Larson argued the cause for respondent. With him on the brief were Jacqueline L. Koch, Drake Lightle, and Gevurtz, Menashe, Larson & Howe.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Husband appeals from a judgment dissolving the parties' marriage and makes two assignments of error. First, he argues that the trial court erred when it treated Exhibit 48 as an expired proxy agreement.[1] Exhibit 48 is an alleged agreement that allowed husband to vote certain shares of wife's stock. Second, he argues that the court erred in denying him spousal support. We review *de novo*, ORS 19.415(3) (2001),[2] and affirm.

Husband and wife have no jointly shared children. Husband is in his mid-sixties and wife is in her late fifties. Husband has an educational background in science, including a master's degree from Harvard. Formerly, husband taught science at both the elementary and high school levels and was involved in coaching sports. Wife has a high school diploma and, before she met husband, assisted her first husband with running a motorcycle business.

The parties were first married in 1973. Shortly afterward, husband became interested in harvesting and marketing blue green algae products, primarily for human consumption. With wife's savings supporting them, husband and wife

---

[1] Exhibit 48 is a typed document signed by wife. It states:

"19 July 1990

"To Whom It May Concern:

"I, [wife], give my right to any voting stock in any corporation in which we are both involved, except Carpenter Construction, to [husband]."

[2] The legislature amended ORS 19.415(3) in 2003. Or Laws 2003, ch 576, § 88 ("Upon an appeal from a [*decree*] **judgment** in a **case that constituted a** suit in equity **under common law**, the Court of Appeals shall try the cause anew upon the record." (Additions in boldface; deletions italicized in brackets.)). We need not decide whether the 2003 amendments to ORS 19.415(3) affect our standard of review because those amendments apply only to the appeal of judgments that were entered on or after January 1, 2004. *See* Or Laws 2003, ch 576, § 90a ("The amendments to ORS * * * 19.415 * * * by sections 85 to 89 of this 2003 Act apply only to the appeal of judgments entered on or after the effective date of this 2003 Act. Any appeal of a judgment entered before the effective date of this 2003 Act shall continue to be governed by the law in effect on the day immediately preceding the effective date of this 2003 Act."). Based on the plain meaning of the text of Oregon Laws 2003, chapter 576, section 90a, we apply the 2001 version of ORS 19.415(3) in this case. *But see Kunze and Kunze*, 337 Or 122, 124, 92 P3d 100 (2004) (apparently citing the current version of ORS 19.415(3) in addressing a judgment that was entered before January 1, 2004).

moved to New Mexico so that husband could assist his brother, a scientist, with the construction of an algae pond. However, in 1978, wife took her children and moved to Illinois, and the parties later divorced.

In 1980, husband and four of his coworkers purchased algae from husband's brother and started a small network marketing distribution system. Husband also assisted his brother with harvesting algae, and they set up a laboratory in San Diego where they began manufacturing algae products for human consumption.

In 1982, husband and wife remarried and moved together to Klamath Falls with the idea that they would begin an algae business using algae from Klamath Lake. Husband's business relationship with his brother ceased, and husband and wife, along with three businessmen, contributed money to form a blue green algae company called Cell Tech International Incorporated (Cell Tech). Husband designed and built an algae harvester and Cell Tech began harvesting, freeze-drying, and processing algae. Husband also worked with distributors. Wife ran the day-to-day aspects of the business—she answered the phone, took and packaged orders, and managed details.

At some point, Cell Tech began to struggle financially, and it was agreed that Cell Tech would be sold to businessman Neil Townsend. Soon afterward, however, husband and wife decided to buy Cell Tech back from Townsend and go into the algae business as partners. Before buying Cell Tech, on July 19, 1990, wife signed Exhibit 48, which provided that husband would control wife's voting rights in wife's shares of Cell Tech stock.

Husband said that he and wife entered into an agreement memorialized in Exhibit 48 due to their working relationship, previous difficulties, and the fact that husband had started the algae business. Husband said that he argued for a 60/40 split of corporate stock but that wife persuaded him that, because Oregon was a joint property state, they should split the stock in half. Husband said that he agreed to split the stock in half on the condition that he would have control of wife's voting rights in the stock.

Wife argues that, at the time she signed the alleged agreement, Townsend's lawyers, Cell Tech's lawyer, and Townsend were at the Cell Tech office and all of the agreements and paperwork documenting husband and wife's purchase of Cell Tech were set out on tables. Wife explained that "[i]t was one hour before the signing, and [husband] pushed this thing under my nose and said, 'Sign this or I'm not going out there to sign the other thing.' " Wife testified that she was forced into signing the agreement and that she did not think that the agreement would be binding. Wife also said that "there was never, ever a discussion of 60/40, from the day we started this, it's always been 50/50."

On August 1, 1990, husband and wife bought Cell Tech from Townsend. Husband served as general manager, chairman of the board, chief executive officer (CEO), secretary, and treasurer of the company. He designed the harvest equipment and assisted with its construction. He also designed the techniques and the process for making algae products, and he produced the algae products. Wife served as president of Cell Tech and was heavily involved with harvesting and laboratory work. Wife continued to oversee the day-to-day details of Cell Tech, including taking orders, packaging, harvesting, freeze-drying, credit card processing, running the computer, and running payroll.

Once Cell Tech began to expand, the roles that husband and wife played in the company became even more defined. Husband focused on network marketing. He recruited distributors for Cell Tech products and assisted them in becoming successful by educating them about Cell Tech products and marketing techniques. It is undisputed that husband is unusually skilled at network marketing. While husband traveled and engaged in network marketing, wife continued to run the company from its headquarters. Eventually, once the company grew bigger, husband and wife were both able to travel and speak with distributors. By all accounts, wife was better with the business and detail aspects of the company. Wife also worked longer hours than husband and was at the office most of the day and evening, seven days a week.

In 1984, husband ceased filing taxes to protest government policies. His failure to pay taxes continued through 1996 and, at that point, he and wife owed approximately $100,000 in penalties and interest to the IRS. Ultimately, due to his failure to pay taxes, husband was convicted of a felony. Because of his conviction, husband decided that it would be too difficult to sell Cell Tech stock if he were on the board of directors or an officer of the company. Husband testified that he and wife agreed that, despite the fact that he could not be officially involved, they would continue to work together, running Cell Tech the same way that they had in the past. Husband also said that they agreed that he would continue to manage the board of directors and the company itself.

At the time of trial, Cell Tech's sales were decreasing each year. In late 1995 and 1996, Cell Tech reached its financial peak when its gross sales reached $200 million dollars. In 2000, Cell Tech incurred a net loss of $2.8 million and, by the end of 2000, its liabilities exceeded its assets by $7.3 million.

On August 6, 1999, a company called HumaScan entered into a "reverse merger" with Cell Tech. Essentially, HumaScan bought Cell Tech and reissued the corporate stock as Cell Tech stock. The purpose of the reverse merger was to facilitate the public registration of Cell Tech stock so that husband and wife could sell their shares of publicly traded Cell Tech stock and satisfy their debt to the IRS.

On November 10, 1999, Cell Tech sent husband a letter terminating his employment with Cell Tech. The letter stated that Cell Tech would like to employ husband as a part-time consultant but that he would no longer be an employee or officer of Cell Tech. At the time of trial, husband was unemployed and was not serving as a consultant for Cell Tech.

Wife stayed on at Cell Tech as the president, CEO, principal executive officer, principal financial officer, and principal accounting officer. Wife is also on the board of directors. In 2000, wife's adjusted gross income was $460,000. Wife testified that her salary from Cell Tech is $290,000 per year and that she also receives money in rent payments for buildings owned by herself and husband, as well as small

stock dividend payments. The rental properties owned by husband and wife are appraised between $12 and $13 million, and all of the properties are rented by Cell Tech. Husband testified that the total monthly income from the rental properties is $95,457. Husband and wife also own approximately 80 percent of Cell Tech stock, which is divided equally between them.

Soon after being terminated from Cell Tech, husband filed for dissolution. On June 7, 2001, husband filed a motion for the entry of a temporary order directing that he be granted voting rights and power in all Cell Tech stock owned by wife. On October 24, 2001, the court issued an order denying the motion. In a letter opinion, the court explained that:

"The validity of [Exhibit 48] is in dispute. [Wife] asserts the document is void because it was made under duress.

"* * * After reviewing the memoranda and considering the testimony presented at the time of the hearing, the court finds Exhibit 48 was intended by the parties as a form of stock proxy agreement. Exhibit 48 does not contain language extending the duration of the agreement. Without express language extending its duration, Exhibit 48 expired after 11 months * * *."

On May 21, 2002, the court entered its judgment of dissolution and money judgment, equally dividing husband and wife's assets and liabilities, including the couple's shares of Cell Tech stock. The court refused to grant wife's voting rights in Cell Tech stock to husband, and it refused to award spousal support to either party. Husband appeals.

■ Husband first assigns error to the trial court's ruling that Exhibit 48 was an expired proxy agreement. He argues that the court should have awarded him the voting rights to wife's shares of Cell Tech stock.[3] Specifically, husband argues that Exhibit 48 is a voting agreement and not a proxy, and

_____

[3] In response, wife makes two arguments that we will address in this footnote. Her first argument is that the trial court's October 24, 2001, order is not appealable. However, husband is not appealing from the order. Rather, he is appealing from the court's judgment.

Wife's second argument is that "[h]usband argues on appeal that the trial court was required to enforce the 'agreement' as a contract, but husband did not make that argument at trial." However, as we explain below, it is not necessary for us to determine the nature of the agreement because the issue in this case is whether the trial court's division of property was equitable.

that, therefore, "[t]he trial court should have treated the agreement as valid and declared husband's right to control the votes connected to wife's shares." However, as husband conceded at oral argument, this court does not have to decide what, in fact, Exhibit 48 constituted because, even if husband is correct that Exhibit 48 is a voting agreement, courts routinely treat voting rights as marital assets. *See Messerle and Messerle*, 57 Or App 15, 19, 643 P2d 1286 (1982) (the trial court "ordered that the common stock be placed in trust for the benefit of both parties, with the voting rights in husband"); *Abraham v. Goff*, 85 Or App 595, 597, 737 P2d 971 (1987) (in a dissolution judgment "the parties were given an undivided interest as tenants in common of 300 shares of stock * * *. Husband was given the right to vote the stock * * *."). In this case, the right to vote wife's shares of Cell Tech stock is an asset that is discrete from the stock itself and, consistently with precedent, we treat the right to vote wife's shares as a marital asset. Furthermore, "a court exercising jurisdiction over the dissolution of a marriage has full equitable powers. ORS 107.405."[4] *Triperinas and Triperinas*, 185 Or App 283, 289, 59 P3d 586 (2002). In other words, a court may "grant the relief authorized by statute in order 'to do equity,' so long as the parties have a fair opportunity to be heard." *Id.* at 290.

Husband next argues that the court's judgment did not constitute an equitable division of property because the court allowed wife to maintain her voting rights in Cell Tech stock. ORS 107.105 provides, in part:

> "(1)   Whenever the court renders a judgment of marital * * * dissolution * * * the court may provide in the judgment:
>
> "* * * * *
>
> "(f)   For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances."[5]

---

[4] ORS 107.405 provides, in part, that, "[w]hen a court is sitting in proceedings for * * * dissolution of a marriage, or for separation, it shall have full equity powers."

[5] ORS 107.105 was amended in 2003. Or Laws 2003, ch 576, § 109. The amendments to the portions of ORS 107.105 that we quote in this opinion do not affect our

The Supreme Court "previously has observed that the legislative intent underlying ORS 107.105(1)(f) is the formulation of a property division at dissolution that is just and proper in all the circumstances." *Kunze and Kunze*, 337 Or 122, 132, 92 P3d 100 (2004) (internal quotation marks omitted). In *Kunze*, the Supreme Court engaged in a statutory analysis of ORS 107.105(1)(f) pursuant to *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). The court explained that, to achieve its directive, "the statute empowers the court to distribute *any* real or personal property that either or both of the parties hold at the time of dissolution * * *." *Kunze*, 337 Or at 133 (emphasis added). Under ORS 107.105(1)(f), if a party establishes that the asset at issue is a marital asset—that the asset was acquired during the marriage "then the court must apply the rebuttable presumption of equal contribution[.]" *Id.* The legislative intent behind the statutory presumption recognizes "that, [in the absence of] evidence to the contrary, each spouse's efforts during a marriage equally contribute to, and are made for the benefit of, the marital estate, *regardless of* the nature of those efforts or *how the property is held.*" *Id.* at 134 (emphasis added).

The question, therefore, is whether the agreement contained in Exhibit 48 is sufficient to rebut the statutory presumption of equal contribution as to the voting rights in the shares of stock. Husband has the burden "of proving by a preponderance of the evidence that the other spouse's efforts during the marriage did not contribute equally to the acquisition of the disputed marital asset." *Id.* However, husband does not argue that the agreement contained in Exhibit 48 rebuts the presumption of equal contribution. Rather, husband argues that the trial court's distribution of stock was not just and proper in all the circumstances—that the result reached by the trial court was not an equitable one. We therefore treat the voting rights as marital assets subject to equal division.

"When the statutory presumption is not rebutted, this court has determined that, absent other considerations,

analysis in this case. Therefore, all references to ORS 107.105 in this opinion are to the 2003 version.

the 'just and proper' division of the marital assets is an equal division between the parties." *Id.* The "just and proper" inquiry "takes into account the social and financial objectives of the dissolution, as well as any other considerations that bear upon the question of what division of the marital property is equitable." *Id.* at 136. Some of the equitable considerations under ORS 107.105(1)(f) "include the preservation of assets; the achievement of economic self-sufficiency for both spouses; [and] the particular needs of the parties and their children[.]" *Kunze,* 337 Or at 136. Furthermore,

> "[t]he trial court's ultimate determination as to what property division is 'just and proper in all the circumstances' is a matter of discretion. This court will not disturb that discretionary determination unless it concludes that the trial court misapplied the statutory and equitable considerations that ORS 107.105(1)(f) requires."

*Id.*

In its letter opinion dated January 29, 2002, the court reasoned:

> "[A] just and proper division of marital assets is an equal division. * * * [N]o one factor is responsible for the decline of Cell Tech's business * * *. It is impossible to predict if the business can surmount these obstacles. On the other hand, it is premature to say it cannot. The impossibility to predict the success or failure of [Cell Tech] dictates that the stock of the parties be equally divided. The primary asset of the parties is their stock in [Cell Tech]. Each party requests the court to award it the stock of the other party. If the court were to do so, whichever party received the Cell Tech stock would either obtain an inequitable windfall or suffer a substantial loss depending upon the future of the business. An equal division of stock represents equal opportunity for both parties."

We agree with the trial court. Cell Tech's financial future is currently uncertain. There is also evidence that, if husband were given the right to vote wife's shares of Cell Tech stock, it would disrupt Cell Tech and both parties would suffer a financial loss. For instance, Richard Hosking, an extremely successful and influential Cell Tech distributor, testified that, if husband were given the right to vote wife's stock, Hosking "would organize the field and see if we

couldn't start up our own company or move to a different company. Eventually, that would destroy [Cell Tech]." We also agree with the trial court that there is credible evidence that "creditors, employees and board members have expressed an unwillingness to work with husband."

Furthermore, as the trial court found, wife's plans for Cell Tech's financial recovery are "more concrete" than husband's. At trial, wife explained that she has several strategies for rebuilding Cell Tech. Wife said that a website had recently been developed and that Cell Tech was introducing new products. She also said that she was hoping to add new distributors through an enhanced compensation plan that had, so far, been very well received. Furthermore, she articulated plans for promoting Cell Tech in order to increase the value of its shares on the stock market.

At trial, husband testified that his strategy for rebuilding Cell Tech includes replacing the board of directors, finding new management, creating a strong financial department, establishing an incentive plan for employees, and finding out what distributors think of the new compensation plan. Husband also testified that Cell Tech needs to be completely revamped, with a new vision, new products, new leadership, new markets, and a new title. Husband conceded, however, that he does not have a new board in mind for Cell Tech, nor does he have an idea of who the new Cell Tech employees might be. Husband also would like to reverse the reverse merger, but we agree with the trial court that "[h]usband's plans to reverse the 'reverse merger' * * * while ambitious, will probably involve protracted and costly litigation that is unlikely to return Cell Tech to the business husband knew."

Wife should be awarded the right to vote her shares of Cell Tech stock; otherwise wife would not receive an equal division of the parties' assets. Additionally, such a division is an equitable one that avoids an inequitable windfall or a substantial loss that one of the parties would have to bear due to the unpredictable nature of Cell Tech's financial future. We therefore affirm the trial court's ruling that husband should not be granted the right to vote wife's shares in Cell Tech

stock because we conclude that the trial court's division of assets was just and proper in all the circumstances.

Husband's second assignment of error is that he should have been awarded spousal support. He first contends that he deserves transitional support because he is unemployed and will need time to obtain employment. He next argues that maintenance support is warranted because he is unemployed, in his mid-sixties, has a felony conviction, and therefore will never achieve a salary like wife's. Finally, he argues that he is entitled to compensatory support due to his contribution to Cell Tech. Husband requests indefinite spousal support of at least $10,000 a month.

ORS 107.105(1)(d) provides, in part:

"The court may order:

"(A)  Transitional spousal support as needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein. The factors to be considered by the court in awarding transitional spousal support include but are not limited to:

"(i)    The duration of the marriage;

"(ii)   A party's training and employment skills;

"(iii)  A party's work experience;

"(iv)   The financial needs and resources of each party;

"* * * * *

"(vii)  Any other factors the court deems just and equitable.

"(B)  Compensatory spousal support when there has been a significant financial or other contribution by one party to the education, training, vocational skills, career or earning capacity of the other party and when an order for compensatory support is otherwise just and equitable in all of the circumstances. The factors to be considered by the court in awarding compensatory spousal support include but are not limited to:

"(i)    The amount, duration and nature of the contribution;

"(ii)    The duration of the marriage;

"(iii)   The relative earning capacity of the parties;

"(iv)    The extent to which the marital estate has already benefited from the contribution;

"* * * * *

"(vi)    Any other factors the court deems just and equitable.

"(C)    Spousal maintenance as a contribution by one spouse to the support of the other for either a specified or an indefinite period. The factors to be considered by the court in awarding spousal maintenance include but are not limited to:

"(i)     The duration of the marriage;

"(ii)    The age of the parties;

"(iii)   The health of the parties * * *;

"(iv)    The standard of living established during the marriage;

"(v)     The relative income and earning capacity of the parties, recognizing that the wage earner's continuing income may be a basis for support distinct from the income that the supported spouse may receive from the distribution of marital property;

"(vi)    A party's training and employment skills;

"(vii)   A party's work experience;

"(viii)  The financial needs and resources of each party;

"* * * * *

"(xi)    Any other factors the court deems just and equitable."

In *Jacobs and Jacobs*, 179 Or App 146, 155, 39 P3d 251 (2002), we explained:

"The legislature has promulgated general guidelines for the award of spousal support. Although it is necessary to consider each case on its own facts, the Supreme Court has developed general principles consistent with those provided by the legislature, so that similar cases will be treated similarly. [*Grove and Grove*, 280 Or 341, 344, 353, 571 P2d 477

(1971).] The factors developed by the court and * * * promulgated by legislature include the goal of economic self-sufficiency. Thus, 'economic self-sufficiency of each spouse is to be the objective of a spousal support order pursuant to the statute. * * * [A] spousal support order must recognize the effects of the marriage upon the capability of [the] spouse for economic self-sufficiency.' *Lemke and Lemke*, 289 Or 145, 149, 611 P2d 295 (1980). It follows that, when there is no legislatively approved purpose to be served by ordering spousal support, none should be ordered."

In its letter opinion, the trial court explained that it found that

"neither party is entitled to spousal support. The court has ordered an equal division of assets. Both parties are in the same uncertain financial condition. Both parties should continue to receive substantial rental income from Cell Tech, although in diminishing amounts as the various properties are sold. Additionally, each party has a claim to one-half the rental arrearage in the amount of $1,120,476.

"Although wife is employed, husband's skills are such that he can readily become engaged as a consultant to either Cell Tech, a competing organization, other organizations in other fields, or start his own competing algae company. Husband's skills and passion for network marketing affords him a potential far greater than wife enjoys."

We agree with the trial court. In this case, both parties have been employed during the marriage and husband leaves the marriage with significantly better skills and a significantly better earning capacity than he had before the marriage. There is no evidence that husband has suffered a lower earning capacity due to the marriage and he is, in his words, "extremely healthy." However, despite his good health and despite his concession that he has been authorized to compete with Cell Tech, he admits that he has not looked for employment since he was terminated from Cell Tech in November 1999. Husband contends that he has not looked for employment because he was spending his time working on his divorce and because he wants to work only for Cell Tech, even though "there isn't any question that I have the ability to sell algae." Husband also said that, although he had originally considered going into marketing and sales for an algae

business, he was, as of trial, unwilling to pursue that idea. Ultimately, we hold that husband has the ability to achieve a standard of living not overly disproportionate to that which existed during the marriage.

We further hold that transitional spousal support for husband is not necessary in this case. Husband is not precluded from working in the field that he is familiar with, and there is no evidence that he requires education and training in order to reenter the job market. Husband argues that, due to the fact that he is in his mid-sixties and has been convicted of a felony, he will not be hired as an employee and it would be unrealistic to expect him to form a new algae company. However, there is no evidence to support husband's argument because he has refused to look for employment and has refused to pursue the idea of starting a competing algae company. Furthermore, husband did not present expert witnesses at trial to substantiate his argument. Additionally, husband's argument that he will need time to obtain employment is not well taken, given that husband has, in the years since he was terminated from Cell Tech, chosen to abstain from a search for employment. There is no evidence that husband requires support in order to make a "transition" to self-sufficiency.

█    We also hold that compensatory support is not warranted in this case. In *Austin and Austin*, 191 Or App 307, 314, 82 P3d 170 (2003), we explained that ORS 107.105(1)(d)(B) has a threshold requirement that must be met before we can consider making an award of compensatory support. To meet that threshold, husband must show that he made a "significant financial or other contribution * * * to the education, training, vocational skills, career or earning capacity of the other party." ORS 107.105(1)(d)(B).

For purposes of this assignment we will assume that husband met the threshold requirement under *Austin*. Nonetheless, husband is not entitled to compensatory support because it would not be just and equitable. We may award compensatory support only if it is "otherwise just and equitable in all of the circumstances." *Austin*, 191 Or App at 314. ORS 107.105(1)(d)(B) "is more broadly directed toward assessing whether one spouse is entitled to compensation for

certain contributions made to the other * * *." *Austin*, 191 Or App at 318.

■  We finally hold that a just and equitable result does not require awarding husband maintenance support because there is no evidence that husband is precluded from being employed full time and supporting himself. Husband does not lack an education or work experience and husband's relative earning capacity is at least on par with wife's. The purpose of maintenance support is "not to eliminate all disparities in the parties' incomes or enable one party to look indefinitely to the other for support, if self-support at a reasonable level is or will be possible." *Roppe and Roppe*, 186 Or App 632, 636, 64 P3d 1145 (2003) (internal quotation marks omitted).

Husband argues that he is not benefitting financially from Cell Tech because wife persuaded him to step down from the board of directors and then fired him. However, the record does not support husband's contention. The evidence in the record shows that the reason husband stepped down from the board of directors was that he was persuaded that remaining on the board of directors with a felony conviction could damage Cell Tech. Furthermore, wife did not fire husband—Cell Tech's board of directors terminated husband's employment with Cell Tech.

Husband makes other arguments that do not merit discussion.

Affirmed.