Argued and submitted June 8, 2007, remanded for further proceedings and with instructions to enter modified judgment awarding husband transitional spousal support in the amount of $15,000 and maintenance support in the amount of $2,500 per month from June 2004 to March 2007 and indefinitely thereafter in that amount minus an amount to be determined by trial court; otherwise affirmed February 6, 2008

In the Matter of the Marriage of

Kathleen Moira VAN RIESEN,
*Petitioner-Respondent,*

*and*

Richard F. CROSS IV,
*Respondent-Appellant,*

*and*

Erica Emily CROSS,
*Statutory Party below.*

Washington County Circuit Court
C021553DRA; A124982

177 P3d 34

Ridgway K. Foley, Jr., argued the cause for appellant. With him on the briefs was Greene & Markley, P.C.

Craig M. Cowley argued the cause for respondent. With him on the brief were Saville W. Easley and Gevurtz, Menashe, Larson & Howe, P.C.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

Husband appeals a judgment of marital dissolution, assigning error to the trial court's failure to award him maintenance spousal support and to the court's division of the marital property. We reject husband's assignment of error concerning the property division without discussion. Accordingly, we write only to address the spousal support award. The trial court awarded husband $25,000 in transitional support, payable in a lump sum. Husband, who was unemployed at the time of trial, contends that he is unlikely to find employment with an income that will allow him to maintain a standard of living not overly disproportionate to that enjoyed by the parties during their marriage. He argues that, in light of his poor employment prospects, the support award was inadequate. On *de novo* review, we conclude that husband is entitled to both transitional and maintenance spousal support.

We take the following facts from the record. The parties were married in 1979 and have two children.[1] Each party has a bachelor's degree and extensive employment experience in the high-tech field. When they were married, both parties worked full time. Wife took seven months' maternity leave when their daughter was born in 1983 and then returned to work part time. When the parties' son was born in 1986, wife took a year of maternity leave. Following that leave, she continued to work part time until 1998, when she returned to full-time employment. At the time of trial, her annual salary was nearly $120,000.

Husband worked full time throughout the marriage until 1996, at which time his employer, Intel, terminated him following a poor performance review. At that time, he was earning $70,000 in annual salary plus $50,000 in bonuses. Husband stopped working in July 1996 but continued to draw some pay while he pursued the first stage of a grievance procedure with Intel. He was officially terminated in January 1997. Husband then pursued the second stage of

---

[1] At the time of trial, which took place in December 2003 and January 2004, their daughter was 20 years old and attending college, and their son was 17 years old.

Intel's grievance procedure, a process that lasted until mid-2001. In the meantime, after taking several months off to recover from the emotional blow of losing his job, husband collected unemployment insurance benefits for a period of 18 months, during which time he actively sought work, albeit without success. When his unemployment benefits ran out, husband found that the stock market was performing so well that the return on market investments was approximately the same as his former salary had been. Husband believed that, if he prevailed in the grievance against Intel, he would recover two million dollars in lost compensation. He therefore concluded that it was worthwhile to focus his efforts on managing the investments and pursuing the grievance, so seeking new employment became a low priority.[2]

In mid-2001, husband began suffering a series of health problems. First, he began experiencing periods of extreme fatigue. In September 2001, a doctor diagnosed him with diabetes. That fall, husband developed a rare and serious form of skin cancer on his face, which resulted in surgery that left a noticeable scar. Husband also discovered that he had a gallstone, which required surgery to remove. Husband also developed dyspepsia, which caused him extreme stomach pain. Husband's dyspepsia left him bedridden from September 2001 until January 2002. During that time, he became seriously depressed. As of the time of trial, husband's dyspepsia and depression continued to be intermittent problems.

Wife separated from husband in February 2002. She moved into an apartment but continued to pay the mortgage and utilities on the family home. Wife filed a petition for marital dissolution in May 2002. As noted, trial took place in December 2003 and January 2004. The primary issues at

---

[2] In a deposition, husband explained that, in his view, the grievance process was "the equivalent of writing a novel," stating that "it had the potential of being the best-paying job I ever had." At trial, he explained further why finding new employment was a low priority:

"[M]y priority was to finish the * * * grievance process. The reason being two million dollars was involved. And there was no other activity that I could do—it's like writing a novel that becomes a movie, you know, you've got an 80-percent chance of failing, but if you win, you win big."

trial concerned spousal support and the division of the parties' major assets, including the family home, another piece of real property, and the parties' various retirement accounts.[3]

With respect to spousal support, husband adduced evidence showing that he was effectively unemployable. He called two expert witnesses from staffing and recruitment firms that place professionals in high-tech jobs in the Portland metropolitan area. Both testified that the job market was very tight and that husband had a number of barriers making it highly unlikely that he would be able to find a job in the high-tech field. Specifically, they cited the stigma resulting from the fact that husband had been terminated from Intel; his absence from the high-tech field for seven years, which meant that his technology skills were several generations out of date; his age—husband was 56, and both witnesses testified that, although age discrimination is illegal, it is prevalent in the high-tech field; and his health problems. One of the witnesses also testified that the scar on husband's face would be "off-putting to a hiring manager." Both witnesses also indicated that husband's personality could pose a problem in finding employment. One witness stated that husband "[came] across like he had * * * a couple of chips on his shoulders." The other described husband as "a little bit combative" and "a little bit narcissistic."

Husband's expert witnesses also discussed the possibility of husband seeking training either to update his high-tech skills or to enter a new field. Both witnesses opined that retraining was not a very practical solution, pointing out that, by the time husband finished such training, he would be very close to retirement age. Both witnesses also suggested that husband could start his own business, but they were rather vague about what husband might do in that regard.

---

[3] Another issue before the trial court concerned the proper disposition of a trust that wife's father, who died in 2003, had created. The trust was created to support wife's stepmother during her lifetime, with any amount remaining upon her death to be shared by wife and her siblings. The trial court concluded that wife had rebutted the presumption of equal contribution, but, as a "just and equitable" matter, it awarded husband 20 percent of the value of wife's share of the trust, to be paid within 30 days of wife receiving her share. Wife's stepmother was still alive at the time of trial, so the court concluded that it could not determine the value of the trust. Accordingly, it did not consider the trust in determining how to divide the marital property.

Both parties submitted uniform support affidavits to the trial court. Wife indicated that her gross monthly income was $9,871, that her expenses for the parties' children were $3,149 per month,[4] and that her personal monthly expenses amounted to $4,027. Husband indicated that his gross monthly income was $490—which he received as a return on investments—that his monthly expenses for the children were $634, and that his personal monthly expenses amounted to $4,721. The parties stipulated to the value of their real property and financial assets, which totaled more than $1.6 million.

Following trial, the court awarded husband $25,000 in transitional spousal support, to be paid by wife immediately in a lump sum. In a letter opinion, the court stated that husband's "greatest prospect of success is to open his own business" and that the "lump sum will provide him a base of support to make his low house payment and his COBRA insurance payment as he develops an income stream."[5] In making the property division, the court awarded husband the "long half" of the property, stating that husband "will need capital to remake his life." Thus, the court awarded husband $31,565 in assets beyond what husband would have

---

[4] Wife included tuition and other college costs for the parties' daughter in calculating her child expenses.

[5] The trial court indicated that it was awarding transitional support rather than maintenance support in an effort to "disentangle the parties as rapidly as possible." The court noted that, on the second day of trial, husband—who fired his attorney after the first day of trial and proceeded to represent himself—gleefully declared, "This is a lot of fun." In the letter opinion, the court stated,

"Wife is correctly concerned that Husband will prolong his 'fun' with appeals and attempted modifications. In so doing, Husband will avoid his responsibility to obtain employment and to move on with his life. Husband is not one to be dissuaded from an unreasonable course of action by a threatened award of attorneys fees. Wife's career has been impaired by the ongoing litigation. The Court is left with attempting to disentangle the parties as rapidly as possible."

We share the trial court's concern about the possibility that husband will see pursuing motions to modify the support award as an attractive alternative to earning income through actual employment. However, in light of husband's employment circumstances, that concern does not justify failing to award sufficient support. Further, if husband does unsuccessfully seek modification, he may be subject to the trial court's exercise of discretion under ORS 20.175 and be liable for some or all of wife's fees incurred in responding to those efforts.

received had the court divided the quantifiable property evenly.[6]

On appeal, husband argues that he is entitled to permanent maintenance spousal support equivalent to one-half of wife's income. He contends that, in light of his age, his health problems, his extended absence from the high-tech field, and the circumstances of his termination from Intel, he is unemployable and thus unable to support himself beyond the $490 a month he earns in investment income. He also argues that the trial court's award of transitional support—which, in the court's view, would allow husband to start a business—was inadequate because there is no indication in the record that he could become self-sufficient within the relatively short period of time that the transitional award would support him. Husband contends that he should be provided enough support to avoid invading his retirement assets prematurely, pointing out that he would incur substantial tax penalties if he withdrew money from his retirement account before age 59½.[7]

In response, wife argues that a spouse seeking financial support has a duty to contribute to his or her own support to the extent possible. She argues that, although husband's expert witnesses testified that husband has no realistic prospect of returning to work in the high-tech field, neither witness precluded the possibility of husband finding work in another field or starting his own business. Wife attributes husband's failure to find employment more to his lack of effort than to his age, his health, or the other circumstances that husband cites. She argues that she should not be required to fund husband's early retirement.

---

[6] The court awarded husband assets valued at $850,313 and wife assets valued at $787,182.

[7] Husband raises a number of other arguments, including that taking a new job could put at risk the health insurance that he currently obtains through wife's employer; that taking a job with less "social value" would effectively diminish his standard of living notwithstanding the compensation; and that, because he provided the majority of the financial support for the family throughout the marriage, it is now "wife's turn" to support him. We reject those arguments without discussion.

■■ We agree with husband in some respects and with wife in others. In deciding whether, how much, and for how long spousal support should be ordered, we do not attempt merely to eliminate any disparities in the parties' incomes or to enable one spouse to look to the other indefinitely for support. *Smith and Smith*, 168 Or App 349, 354, 7 P3d 559 (2000). "The primary purpose of spousal support is to provide a not-overly disproportionate standard of living to that achieved during the marriage when the supported spouse cannot do so on his or her own." *Id.*

We disagree with wife's contention that husband has chosen to retire early and that he should thus bear the financial consequences of that decision. This is not a case like *Kollman and Kollman*, 195 Or App 108, 96 P3d 884 (2004). There, we rejected the husband's request for spousal support because the evidence showed that he had marketable skills, a proven ability to start and run a business, and a relative earning capacity that was "at least on par" with the wife's earning capacity. *Id.* at 121-23. The only impediment to the husband realizing his earning potential was his refusal to either look for employment or start a business in the field that he was familiar with. Thus, we held that transitional support was inappropriate because there was no evidence that the husband intended to make a transition to employment and that maintenance support was inappropriate because there was no evidence that he was "precluded from being employed full time and supporting himself." *Id.* at 122-23.

■ Here, the record does not support wife's contention that husband's employment predicament is attributable to a lack of effort on his part. Husband testified—and wife expressly did not contest—that he actively sought work for 18 months after being terminated by Intel. After that, although seeking *new* employment became a low priority, husband put substantial effort into the grievance process at Intel in an effort to restore his income. We might question the wisdom of husband's decision to focus on the grievance rather than seeking a new job, given the low likelihood of the grievance's success, but we cannot say that husband failed to make a sufficient effort. Shortly after the grievance process

ended, husband's health began to fail, and we cannot say that he is at fault for not finding a job during the months that he was effectively disabled. By the time his health began to recover, husband's age and the duration of his absence from the high-tech field—more than five years at that point—already made it highly unlikely that he would be able to find employment in that field. It is true that, in the time leading up to trial, husband voluntarily forwent actively seeking employment in order to work on his dissolution case, but it is unlikely that his lack of effort in the job market during that period of time did anything to worsen his prospects for earning a substantial living.

■    Whatever the cause of husband's employment situation, there is no dispute that it is highly improbable that he will find employment in the high-tech field and earn a salary comparable to what he earned at Intel. The trial court acknowledged that in making the transitional support award of $25,000, which the court evidently intended for husband to use to support himself while opening a business. That amount of transitional support would, together with husband's $490 in monthly investment income, cover husband's living expenses—as set out in his uniform support affidavit, which wife does not challenge—for only six months.[8] Although the record shows that husband is, as the trial court put it, blessed with great skills and intelligence, he has no entrepreneurial experience, and nothing in the record indicates that a market exists for any of husband's skills. The record simply does not support the conclusion that he would be able to become self-supporting in six months. Thus, we conclude that other support is necessary. Specifically, we conclude that maintenance support is appropriate. We turn next to a determination of the amount of support.

■    On this record, it appears doubtful that husband can earn a living that approaches his former salary in any field—not simply in the high-tech industry. Nevertheless, we reject

---

[8] As noted, the trial court also awarded husband the "long half" of the marital property—$31,565 beyond what husband would have received had the court split the property evenly—in order to give husband "capital to remake his life." If husband used that money to support himself rather than investing it in a business, it would support him for an additional seven to eight months.

husband's contention that he is unable to earn *any* income by working and thus is entitled to half of wife's income.[9] We agree with wife that husband has an obligation to support himself to the extent possible. *See Latimer and Latimer*, 103 Or App 43, 47, 795 P2d 1102 (1990) (the party seeking spousal support has an obligation to contribute, if able, to his or her own support). Despite husband's health problems, he is not disabled. In calculating husband's child support obligations, the trial court imputed to husband $1,221 per month in income from work, the amount he would earn at minimum wage. We think it equitable to impute the same amount in determining husband's ability to provide for his own living expenses.

Although we conclude that husband is capable of working, given his age, health problems, and specialized work experience, we recognize that it may take some time for him to find suitable work, even at minimum wage. For that reason, we conclude that both maintenance support and transitional support are appropriate. However, because making the transition to a job is likely to take less time and resources than starting a business, as the trial court contemplated, we reduce the amount of the transitional support award to $15,000.

Our determination of the maintenance support award takes into account husband's monthly investment income of $490, the $1,221 in imputed monthly income, and the "long half" of the trial court's property division, which is available for husband's support.[10] *See Smith*, 168 Or App at 354 ("In assessing the need for spousal support, the court

[9] Even if husband were not able to support himself at all, we would not simply award him half of wife's income without first considering husband's financial needs. The purpose of spousal support is not to equalize the parties' incomes, *Schnebly and Schnebly*, 145 Or App 188, 196, 930 P2d 225 (1996), but to enable the parties to live separately at a standard of living not overly disproportionate to that enjoyed by them during the marriage, to the extent possible, *McCarthy and McCarthy*, 170 Or App 183, 190, 12 P3d 519 (2000).

[10] As noted, the trial court awarded husband the "long half" of the marital property—$31,565 in assets beyond what husband would have received had the court divided the quantifiable property evenly. Thus, for example, if husband apportioned the "long half" into equal monthly allotments from the time of the dissolution until he turns 62—at which point he will be eligible to draw social security benefits—it would provide him with $493 per month plus interest or other appreciation in value.

must consider the other financial provisions of the judgment, and none can be considered in isolation."). In our view, at the time of the dissolution judgment, $2,500 per month in spousal support would have been sufficient to allow husband to maintain a lifestyle not overly disproportionate to that enjoyed by the parties during the marriage. Our analysis does not end there, however.

As noted above, part of husband's argument in requesting spousal support is that drawing on his retirement accounts before age 59½ would result in substantial tax penalties. Given that our maintenance support award assumes that husband will work full time, we agree with husband that it would be inequitable to force him to rely on his retirement assets prematurely when doing so would require sacrificing a portion of those assets—on which husband will rely later in life—in the form of tax penalties. However, when those penalties no longer apply, we also think it would be inequitable to require wife to continue to pay support at the same level, given that husband will have available a new, penalty-free source of income. *See Dopson and Dopson*, 177 Or App 272, 279, 33 P3d 1019 (2001) ("step-down" support is warranted where the evidence shows that the supported spouse will enjoy an increase in income); *Murphy and Murphy*, 151 Or App 649, 653, 950 P2d 377 (1997) (in determining the amount and duration of spousal support, courts consider the goal of ending the support-dependency relationship within a reasonable time). Thus, wife's monthly obligation should be reduced by an amount equivalent to the distributions that husband takes from his retirement accounts when the penalties no longer apply. If husband's minimum distributions total more than $2,500 per month, wife's support obligation terminates.

We note that husband reached the age of 59½ in March 2007. Thus, wife's support obligation should be reduced (or terminated) as of April 2007, when husband first became eligible to draw on his retirement accounts without penalty. We can only speculate on this record as to the amount of the distributions from those accounts, so we cannot say how much wife's support obligation should be reduced; thus, we must remand to the trial court to take evidence and determine the amount of husband's distributions from his retirement accounts.

In short, with respect to maintenance spousal support, we award husband support in the amount of $2,500 per month for 34 months[11] and, indefinitely thereafter, in an amount to be determined on remand.[12]

Remanded for further proceedings and with instructions to enter modified judgment awarding husband transitional spousal support in the amount of $15,000 and maintenance support in the amount of $2,500 per month from June 2004 to March 2007 and indefinitely thereafter in that amount minus an amount to be determined by the trial court; otherwise affirmed.

---

[11] Thirty-four months passed from the date of dissolution of the parties' marriage until husband reached the age of 59½.

[12] For tax purposes, the support payments shall be treated as husband's income and shall be deductible by wife.