Argued and submitted November 12, 2008, affirmed February 18, 2009

In the Matter of the Marriage of

Jill Carmen TALIK,
*Petitioner-Respondent,*

*and*

David Andrew TALIK,
*Respondent-Appellant.*

Douglas County Circuit Court
05DO1762DS; A134376

202 P3d 267

George W. Kelly argued the cause and filed the briefs for appellant.

Gilbert B. Feibleman argued the cause for respondent. With him on the brief was Feibleman & Case, P.C.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Barron, Judge pro tempore.*

BARRON, J. pro tempore.

---

* Barron, J. pro tempore, *vice* Wollheim, J.

**BARRON, J. pro tempore**

Husband appeals from a judgment dissolving his 14-year marriage to wife. He raises three assignments of error, asserting that the trial court erred in calculating the amount of child support, denying him compensatory spousal support, and limiting his parenting time. We review *de novo* and affirm.

Husband and wife met in 1989 while they were undergraduates at the University of Arizona. Wife graduated in 1991 and then began medical school. Husband graduated in the spring of 1992, and he and wife married in the fall of that year. Husband resumed schooling in 1993 to become a certified teacher. While husband was an undergraduate, he worked for America West Airline in Tucson. He continued that job after the marriage until 1996, when the parties moved to Iowa so that wife could begin her residency. Husband worked enough hours each year so that he and wife qualified for health insurance through his employer. Both husband and wife received student loans for school, and wife used money she earned during the summer for her schooling. Wife's student loan debts were much higher than husband's. During the course of the marriage, husband handled the parties' finances and, in doing so, paid off most of his student loan debt. At the time of the dissolution, wife still owed more than $50,000 on her student loan debt.

In April 1994, husband and wife's first child, J, was born and, in May 1995, their second child, K, was born. Their third child, KY, was born in January 2003.

In the middle of 1994, wife decided to do her fifth year of medical school in Denver rather than continue at the University of Arizona. That decision was made because wife hoped to do her pediatric residency in Denver and because the parties had family support in Denver. Husband was able to transfer his job to Denver from Tucson, because America West had field stations at both airports. Husband's transfer occurred in November 1994, and for six weeks he flew back and forth between the two cities to help care for the children until the entire family moved to Denver. While in Denver, husband, wife, and their family members took care

of the children. Husband completed his student teaching from January to May 1995, and wife graduated from medical school in May 1996. Husband did not seek a teaching position because it would have interfered with his time with the children and "meant a lot of day care." The parties also agreed it would be better to have a parent available for child care.

Although wife applied for residency at cities where America West had field stations, she ultimately accepted a residency in Iowa City, and husband quit his job to move to Iowa. Husband stayed at home with the children for the first year of wife's residency, but thereafter did some substitute teaching and handyman work. During that time, the children were in daycare three days a week. Wife was busy completing her residency, which she did in three years. The parties then moved to Roseburg in 1999.

In Roseburg, wife joined an existing practice with four other physicians and was very busy in that practice. Husband also worked during that time, including two long-term teaching jobs in 2000 and 2002. Husband's jobs allowed him to pick up the children from school, although the parties also had a nanny who helped them.

As indicated above, the parties' third child was born in 2003. Wife did not work for three months after KY was born and, when she returned to work, she worked only three days a week. After a few months, wife extended her work schedule to four days a week and was also involved in work-related activities; she later resigned from such activities because there were too many meetings. Meanwhile, husband did some substitute teaching, but also provided care for the children. At times, husband did not teach because of wife's schedule and because work at home needed to be done. In the spring of 2005, at a time when the marriage was having problems, wife prepared a document that memorialized the arrangement that had been in place throughout the marriage. It stated:

> "You will fulfill your agreement to remain at home and be 'Mr. Mom' until we agree that our daughter is old enough that you can pursue extra schooling or a job part

time. Failure to keep your agreement will be interpreted as a request for legal separation or divorce."[1]

In November 2004, husband had an argument with J and kicked him. When wife confronted him about the incident, husband admitted he was wrong. In March 2005, K disclosed to a psychiatrist that husband hits J and him and that for two years he had been afraid and sad. Husband admitted to wife that he had been physical with J and K for four or five years. Husband attended a three-week anger management program and, by the summer of 2005, he returned to the home. A behavioral pediatrician did a custody evaluation and recommended that wife be awarded custody because she had a closer emotional bond with the children and was more predictable. She also recommended a parenting time plan that was adopted by the trial court, even though it was more restrictive than commonly used plans, "to ensure the emotional and physical well being of J, K and KY." J and K have emotional problems due in large part to husband's behavior—behavior that is unlikely to change significantly.

Wife's income since 2001 has varied from a low of $149,000 in 2003 to a high of $272,000 in 2005, which was unusually high because of circumstances that will not occur again. In 2006, after the practice group dissolved, wife and another physician started a new practice. At the time of the dissolution trial, they were planning to bring another physician into the practice and were saving money to do so. An accountant, one of wife's witnesses at the dissolution trial, testified that, in his opinion, wife's income would be about $160,000 for 2006. That testimony was consistent with wife's uniform support affidavit, which the trial court adopted as wife's income for support purposes. The trial court set husband's potential income at about $55,000 a year, based on the testimony of a vocational rehabilitation counselor and a real estate broker, husband's testimony that he was a good salesman, and evidence indicating that he was a good teacher.

---

[1] The trial court found, "By agreement, Husband was the primary care giver of the children throughout the entire relationship, giving Wife the opportunity to obtain her medical degree, complete her residency and pursue her professional career in Roseburg."

The property and debt division favored husband by $28,000. He received a residence, as did wife, with wife being responsible for the debt on husband's property. She received her practice and retirement account. The court also allocated most of the debts, including the remaining $52,000 left on her school loans, to wife. Husband was allocated his school loans, but the amount was only $1,300 because husband, who handled the family's finances, had paid off most of his school loans.

■     We begin with husband's third assignment of error, which pertains to parenting time, followed by the second assignment of error, which pertains to spousal support, because the outcome of those assignments could affect our resolution of the first assignment of error. In his third assignment of error, husband argues that the trial court erred in limiting his parenting time in spite of the fact that he was the primary caregiver during the marriage. Because the trial court had the advantage of hearing and seeing the testimony of husband, wife, and the custody evaluator, we give deference to the trial court's implied credibility findings. *Johnson and Johnson*, 138 Or App 462, 465, 909 P2d 185 (1996). The trial court found that husband's behavior negatively affected the children. The court explained:

> "Husband acknowledges the November of 2004 incident involving [J], and it should be noted that the Court found his off-handed reference to 'the infamous kick of [J]' somewhat disturbing as the Court did not find the incident to be a source of humor - especially in light of the emotional state of [J] and [K]."

■     Husband also acknowledged that he had been physical with J and K for four or five years, and that he had an anger management problem for which he had sought help and improved. Based on information the custody evaluator had, she believed that it is unlikely that husband will significantly change how he behaves. We do not need to further detail all of the testimony relating to parenting time. The evidence concerning husband's abusive behavior and the emotional problems it has caused J and K, along with the custody evaluator's recommendations, are more than sufficient to justify the trial court's limit on husband's parenting time.

■    We next address husband's contention that the trial court erred in failing to award him compensatory support.[2] Husband contends that he made a significant contribution to wife's education, training, and career, and that it is just and equitable that he be awarded compensatory support. Wife argues that husband did not make a significant contribution and that, if he did, it is not just and equitable to award him compensatory support. After discussing the factors relating to compensatory support under ORS 107.105(1)(d)(B)(i) to (vi), the trial court ruled:

> "Assuming for the sake of argument that the role of Husband fits developing Oregon case law as a 'significant financial or other contribution by one party to the education, training, vocational skills, career or earning capacity of the other party,' ORS 107.105(1)(d)(B), it is the Court's opinion that it is not 'just and equitable in all of the circumstances' of this case to grant Husband's request. No worthwhile purpose is served by repeating the discussion regarding the consequences of Husband's abuse of [J] and [K]. Husband did not provide a safe and nurturing home for the children, and he should not be rewarded for that failure with an award of spousal support."

The starting point for our discussion is ORS 107.105(1)(d)(B)(i) to (vi), which provides, in part:

> "Whenever the court renders a judgment of marital * * * dissolution * * * the court may provide in the judgment:
>
> "* * * * *
>
> "(d)   For spousal support, an amount of money for a period of time as may be just and equitable for one party to contribute to the other * * *. In making the spousal support order, the court shall designate one or more categories of spousal support and shall make findings of the relevant factors in the decision. The court may order:

---

[2] Unlike the husband in *Kollman and Kollman*, 195 Or App 108, 96 P3d 884 (2004), husband argued in the trial court and this court that he was entitled to only compensatory spousal support. He did not raise his possible entitlement to either transitional or maintenance support, and we therefore do not address any such entitlement. *See Austin and Austin*, 191 Or App 307, 322 n 3, 82 P3d 170 (2003).

"* * * * *

"(B)  Compensatory spousal support when there has been a significant financial or other contribution by one party to the education, training, vocational skills, career or earning capacity of the other party and when an order for compensatory spousal support is otherwise just and equitable in all of the circumstances. The factors to be considered by the court in awarding compensatory spousal support include but are not limited to:

"(i)  The amount, duration and nature of the contribution;

"(ii)  The duration of the marriage;

"(iii)  The relative earning capacity of the parties;

"(iv)  The extent to which the marital estate has already benefited from the contribution;

"(v)  The tax consequences to each party; and

"(vi)  Any other factors the court deems just and equitable."

We first discussed compensatory spousal support under the current version of the statute in *Austin and Austin*, 191 Or App 307, 82 P3d 170 (2003). *Austin* made clear that, to be entitled to compensatory spousal support, the party claiming such support must meet the threshold requirement that the party has made a "significant financial or other contribution" to one of several areas described in the statute. *Id.* at 314. The significant contribution is not limited to enhancing the earning capacity of the other party because that is only one of the "areas to which a spouse may contribute in order to meet the threshold requirement for compensatory spousal support." *Id.* A contribution to the education, training, or career of the other party is sufficient. *Id.* If a party meets the initial threshold, then the court must determine whether a compensatory spousal support award is "otherwise just and equitable in all of the circumstances." *Id.*

In the present case, there is no doubt that husband has met the initial threshold of making a significant contribution to the education, training, and career of wife. As noted above, the trial court found that husband was the primary caregiver for the children by agreement of the parties

throughout the entire relationship, thereby allowing wife to obtain her medical degree, complete her residency, and pursue her career as a doctor. Obviously, this also enhanced her earning capacity. In addition, husband performed homemaking duties and, at times, did not substitute teach because he had to catch up on household chores.

In *English and English*, 223 Or App 196, 209, 194 P3d 887 (2008), in describing why the wife met the initial threshold for an award of compensatory spousal support, this court stated:

> "We believe that the trial court's award of compensatory spousal support was proper under ORS 107.105(1)(d)(B). First, we find that wife has met the threshold requirement of a significant contribution to husband's training, career, and earning capacity. As stated earlier, wife's maintenance of the marital home and responsibility as the primary custodial parent to the parties' two children for 11 years, as well as her homemaker contribution in the years before the separation, allowed husband to advance his career with Jeld-Wen and to enhance his yearly income. Because of wife's contribution in that manner, husband was able to obtain training and education during his employment and advance within the corporate hierarchy. Husband directly and indirectly benefitted in his career and earning capacity from wife's contribution to the marriage."

Here, in its letter opinion, the trial court assumed that husband met the threshold requirement but found that a compensatory spousal support award would not be "just and equitable in all of the circumstances" because of husband's abuse of J and K. The trial court's reliance upon husband's abusive behavior as a basis for denying compensatory spousal support was error. In *Garza and Garza*, 201 Or App 318, 329, 118 P3d 824 (2005), a case in which the wife claimed that a compensatory spousal support award could be based in part on the husband's mistreatment of her, the court held:

> "Finally, we consider any other relevant factor as provided in ORS 107.105(1)(d)(B)(vi). In particular, we consider whether husband's 'mistreatment' of wife is a proper basis of compensatory spousal support. The trial court regarded the factor as relevant. We do not. As we have

noted, the focus of the statute is on compensation for wife's contributions to husband's education, training, vocational skills, career, or earning capacity. *Austin*, 191 Or App at 314. *It is not a vehicle by which a spouse may be punished for unrelated opprobrious conduct.*"

(Emphasis added.)

■        Similarly, a spouse cannot be denied compensatory spousal support for opprobrious conduct that is unrelated to his or her "significant financial or other contribution * * * to the education, training, vocational skills, career or earning capacity of the other party * * *." ORS 107.105(1)(d)(B).[3]

Although the trial court's stated basis for denying compensatory spousal support to husband on the ground that it would not be "just and equitable in all the circumstances" was incorrect, we review the case *de novo* and must make our own determination of whether such an award is "just and equitable in all the circumstances." We find that it is not.

■        Husband has the economic capability to be self-sufficient without spousal support based on his working as a teacher and real estate broker. *See Jacobs and Jacobs*, 179 Or App 146, 155, 39 P3d 251 (2002). Husband also received the long half of the property division, and he leaves the marriage with very little debt, compared with the substantial debt assigned to wife in the property division. In regard to the debt, husband was in charge of the family's finances during the marriage and paid nearly all of his student loans off while leaving wife with a substantial amount still remaining due on her student loans. Further, the record indicates that, at one point during the marriage, wife inherited money, some of which was intended for the children. As a result of husband's management of the finances, that money was removed from the children's accounts and placed in the marital account. Husband was unable to adequately account for what he did with the money. Such conduct is a relevant factor in considering whether it is "just and equitable in all of the circumstances" to award compensatory spousal support. ORS 107.105(1)(d)(B). *See Garza*, 201 Or App at 330.

---

[3] At wife's request, the trial court did require husband to pay $200 per month as a medical cost for J and K's counseling, which was necessary because of husband's abusive behavior.

■    Finally, husband argues that the trial court erred in determining the parties' respective incomes and, consequently, erred in determining the amount of child support. Wife not only testified about her income, she also presented the testimony of an accountant who was very familiar with the sources of her income. She also called witnesses who testified as to what husband could earn as a teacher and real estate agent. Husband called no witnesses other than himself. On appeal, he argues that his yearly income should not be set at $55,000, but rather should be $30,000 a year. The problem with husband's argument is that it is, as he admits, a guess. He claims that the trial court's figure is also a guess, but the record indicates that the trial court's finding as to husband's potential income is based on the testimony of a vocational counselor and of a real estate broker who works in Roseburg. Moreover, the trial court had the opportunity to see and hear the witnesses and accepted their testimony. We defer to the trial court's finding as to husband's potential income. *Johnson*, 138 Or App at 465.

■    As to wife's income, husband points out that wife has, in the past, had an income higher than that set by the trial court. It is true that her income in some years has been higher, especially in 2005, but wife and the accountant she called as a witness both testified that 2005 was an unusual year and would not be repeated. Further, wife left an established practice to set up a new practice with another physician from her former practice. They also decided to hire another physician to join the new practice, which would initially be a cost to them. Again, the trial court had the opportunity to see and hear the witnesses, and its finding as to wife's income is supported by the evidence.[4]

    Affirmed.

---

[4] In *Briggs and Briggs*, 49 Or App 569, 571-72, 619 P2d 1353 (1980) (quoting *McCoy and McCoy*, 28 Or App 919, 926, 562 P2d 207 (1977)), a case involving the issues of spousal support and property division, the court stated:

"'While de novo review may be characterized as a trial anew, the burden is on the appellant to show that the lower court made a mistake. Where there are viable alternatives available, often no two courts can agree which is the preferable. There is often no perfect remedy, but merely a choice between several dull axes. * * * The role of the appellate court is not to substitute its preferences for that of the lower court * * * unless our preference is motivated with sufficient conviction to proclaim that the trial court made a mistake.'"