Argued and submitted November 6, 2014, transitional support award reversed and remanded, property division vacated and remanded, otherwise affirmed March 16, 2016

In the Matter of the Marriage of

Nelva Lee JOHNSON,
*Petitioner-Respondent,*
*and*

Bart Anthony JOHNSON,
*Respondent-Appellant,*
*and*

Patricia JOHNSON-EWING,
*Respondent below.*

Washington County Circuit Court
C102470DRC; A153575

370 P3d 526

George W. Kelly argued the cause and filed the briefs for appellant.

David N. Hobson, Jr., argued the cause for respondent. With him on the brief was Hobson and Associates, LLC.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Husband appeals a general judgment of dissolution, asserting four assignments of error. The first two involve husband's contention that the trial court erred by awarding wife indefinite transitional and maintenance support. In his third and fourth assignments of error, husband challenges the trial court's denial of his motion to supplement the record and its division of the marital property. We write to address husband's first, third, and fourth assignments of error, and affirm the award of maintenance support, the subject of the second assignment of error, without written discussion. We affirm the trial court's denial of husband's motion to supplement the record, reverse and remand the judgment for the trial court to reconsider the award of transitional support, and vacate and remand the property division for the court to make the appropriate findings.

Husband requests *de novo* review; however, because this is not an exceptional case, we decline to exercise our discretion to apply such review. *See* ORS 19.415(3)(b) (we have discretion to apply *de novo* review in equitable actions); ORAP 5.40(8)(c) (stating that we will exercise our discretion to apply *de novo* review only in exceptional cases). Therefore, we "state the facts consistently with the trial court's express and implied findings, supplemented with uncontroverted information from the record." *Stuart and Ely*, 259 Or App 175, 177, 313 P3d 317 (2013) (internal quotation marks omitted).

The parties met in 1979, shortly after wife graduated from high school, and moved in together that same year. They married in 1984 and had a son in 1986. The parties separated around June of 2010. Wife was 49 years old and husband was of similar age at the time of the dissolution.

Around the time of the parties' separation, wife suffered an apparent mental breakdown, the cause of which is not clear from the record. She displayed a "set of acting out behaviors" and delusional thinking, symptoms associated with psychotic process and post-traumatic stress disorder (PTSD). During that period of time, wife was drinking and smoking marijuana heavily. She also engaged in activities that led to criminal charges, including possession of

marijuana, unlawful possession of a firearm, first-degree burglary, first-degree theft, and criminal mischief. Some of the charges were dismissed and others resulted in convictions. Husband described wife's behavior as bizarre and unusual for her.

Eventually, wife's condition stabilized, but she had by that time been fired from her job. Before her discharge, she had worked as a senior administrator at Intel, earning $25 an hour, plus bonuses and benefits. She holds a high school diploma and has completed some community college courses but has had difficulty finding new employment. The vocational expert who testified at trial opined that wife's criminal record and her discharge would prevent her from returning to a similar employment position and that she would have to either find entry-level clerical positions that were "felony-friendly" or seek low-wage, production positions that involved manual labor, which the vocational expert acknowledged would also be difficult for her to obtain. She estimated that it would take wife six to eight months to secure the latter type of employment. The vocational expert concluded that, professionally, wife would have to start all over again. She opined that wife's best option would be to develop a plan where she would seek unpaid volunteer work and participate in additional training to update her clerical and administrative skills, which would place her in a better position to reenter her previous field of employment. She also recommended that wife seek to have her criminal record expunged starting in January 2014, when she would first be eligible to do so, and that she should complete a six-week program through Better People, a nonprofit dedicated to helping convicts reenter the workforce. Wife testified that she was willing to follow the vocational expert's recommendations.

We move to facts relevant to the property division. During the years that the parties were together, they lived on property owned by husband's mother, Ewing. At first, they lived in Ewing's home, but they later moved to a separate rental property, also owned by Ewing, which consisted of a house on 10 acres of land. We refer to that property in its entirety as Tax Lot 400. The parties did not pay rent while living on that property, except for the first year or so after

moving in, nor did they pay any property taxes or insurance. Then, in 2000 or 2001, Ewing gave the parties permission to tear down the rental house where they had been living and to build a new house on that lot. The "deal," according to Ewing, was that the parties "could live [in the new house] as long as they paid the property tax and insurance, but if for any reason they decided they didn't want to live there, if they [left] then it came back to [Ewing]." Eventually, Ewing, as the title holder of Tax Lot 400, placed the property into a trust.

After building the house on Tax Lot 400, the parties bought 80 acres of land adjacent to that lot. To acquire the 80 acres, they traded a 13-acre lot that they had previously purchased with wife's inheritance money and paid about $88,000 more. The $88,000 came from a line of credit that husband obtained from West Coast Bank; Ewing cosigned on the line of credit, but wife was not a named borrower. Husband testified that he started making $1,000 monthly payments on the $88,000 loan balance beginning in December 2004. However, as of the trial date—August 2012—the loan balance was approximately $73,000. When asked by the trial court why the balance was still so high, husband explained that he had borrowed an additional $20,000 on the line of credit in order to buy an excavator, as well as $9,000 to pay for his divorce legal fees. Husband then explained that the excavator was not listed as a marital asset because he had sold it for $19,000 and used the proceeds to make improvements on the 80-acre property, such as installing a septic system and improving the driveway. The appraiser who testified regarding the value of the 80 acres did not identify those improvements in his assessment and simply stated that the "80 acres looked to be forested, second growth" worth $375,000.

In addition to the 80 acres, husband acquired a one-third interest in 20 acres of another property; the remaining interest was split between Ewing and husband's brother. The three of them appeared to have owned the property jointly with a right of survivorship. Husband purchased his interest with about $5,000 that he inherited from his grandparents during the marriage. He testified that he did not commingle the inheritance money with marital assets

at any point in time; instead, his inheritance went directly towards contributing to the $20,000 family purchase of the 20 acres, now valued at $95,000.

The trial court issued a letter opinion in which it made express findings of fact. It awarded wife $500 per month in indefinite transitional spousal support and $2,000 in indefinite maintenance support, stating:

> "[Wife's] income, to follow the path set out by the vocational expert, will be $0 now to allow her to get back to reasonable income in the near future. Because of her financial situation she needs the support of [husband] until she can get back on her feet.
>
> "* * * * *
>
> "[Wife] is essentially unemployable now and would need 6 - 8 months to get a minimum wage job at a gas station, according to the vocational expert.
>
> "Her record can potentially be cleared in January of 2014 and by following the path of volunteering and keeping her skills up she can be more successful then.
>
> "* * * * *
>
> "* * * [Wife] needs the support now so he will pay $500 per month transitional support and $2,000 maintenance support, both to be indefinite, since we do not know how long the transitional will be needed. When [wife] gets her record cleared and gets a reasonable paying job that will be considered a change sufficient for the court to consider a modification."

In the dissolution judgment, the court ordered wife to "make reasonable efforts to allow her to obtain reasonable paying employment in the future."

As to the division of property, the trial court found that neither wife nor husband had any interest in Tax Lot 400 and, thus, it did not assign value to that property. The trial court then called for the sale of the 80 acres and directed that the profits of the sale be used to pay the amount owed on the line of credit ($73,148), less the $29,000 that husband had taken out afterwards. That is, the court implicitly found that the $29,000 that husband had borrowed against the

line of credit was not a marital debt. The court also awarded husband title to his one-third interest in the 20 acres after factoring its value into the marital property. As to that property, the court stated:

"In a 33 year marriage where [husband] is living in a $400,000 home rent free for life (in the court's opinion based on the testimony of all three of the parties and the fact they had already lived there rent free for over 30 years). It is just and proper to include all assets of the marital estate, therefore [husband's] 1/3 interest in [20 acres] is awarded to [husband] with the value of $32,300. It is also just and proper to award [wife] a slightly longer half of the property and a higher amount of spousal support * * *."

After the trial court issued its initial letter opinion, husband filed a "motion to supplement the record." Husband, it appears, wanted to supply the court with evidence that the $29,000 he borrowed was indeed used to make improvements to the 80 acres during the marriage and was therefore a marital debt. The court denied husband's motion in a second letter opinion, stating:

"After a review of the testimony and my notes from trial, I am still concerned with the credibility of husband (H). His testimony was guarded and he even disputed that the information in [his attorney's] documents came from him.

"* * * * *

"The court will not allow the record to be supplemented as the documents supplied by [husband] do not support his allegations. The court cannot trace the funds to the proffered documents. Where was money held, how spent, who owned the account where funds were held, and most importantly, how could such an improved site not be noticed and valued by the appraiser. In reviewing the appraiser's testimony there was no indication of any evidence of work on the property.

"The fact [husband] claimed the LOC as a marital debt required him to notify his attorney and the court that there had been additional charges against the credit line. He did not do this or his attorney would have included this information. Again this causes the court concern with [husband's] credibility.

"The original decision on the LOC and its repayment are unchanged. [Husband] did not repay the $20,000 from the excavator which he had borrowed from the LOC. Also he did not disclose until nearly the close of testimony that he had borrowed (and did not repay) $9,000 from the LOC as well and was requesting wife be partly responsible for that obligation. This was also not repaid. [Ewing] gave [husband] apparently unfettered access to the LOC (or she knew how the funds were being spent) and she has some responsibility for this."

On appeal, husband contends that the trial court erred in awarding indefinite transitional support and in its division of property. We review the court's legal conclusions for legal error. *Stuart*, 259 Or App at 180. Furthermore, we will not disturb the trial court's discretionary determinations, "unless the trial court misapplied the statutory and equitable considerations required by ORS 107.105." *Berg and Berg*, 250 Or App 1, 2, 279 P3d 286 (2012) ("[T]he trial court's award will be upheld if, given the findings of the trial court that are supported by the record, the court's determination that an award of support is 'just and equitable' represents a choice among legally correct alternatives."). We address each of husband's assignments of error in turn.

First, we consider the trial court's award of transitional spousal support. On that issue, husband argues that the trial court erred by (1) awarding transitional spousal support in any amount and (2) making the award indefinite. According to husband, ORS 107.105(1)(d)(A) authorizes an award of transitional spousal support only if a spouse seeks to attain education and training to reenter the job market. He argues that wife in this case already had education and training and that she never indicated that she intended to undertake further education or training. Moreover, husband contends that, even if that type of support was appropriate, the court erred in making the award indefinite. He argues that the statute does not provide for "indefinite" support and claims that "transitional" necessarily means temporary, given that such support is meant to assist a person to achieve specific educational or professional goals, like completing a college degree.

Wife argues in response that the trial court did not err by awarding indefinite transitional spousal support "to assist [her] in preparing for reentry into the job market and for advancement therein." Wife's position relies on the vocational expert's testimony recommending that wife take classes to update her administrative skills and to stay current on computer software in order to be competitive. Additionally, wife argues that the court did not err by making the award indefinite because no case law or other authority precludes an indefinite award. She contends that, because this type of award can be modified, it can be imposed indefinitely at the outset.

In a dissolution case, a trial court has the authority to award transitional spousal support "as needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein." ORS 107.105(1)(d)(A). In deciding whether and how to award transitional support, a court may consider, in part: (1) "the duration of the marriage," (2) a "party's work experience," (3) the "financial needs and resources of each party," and (4) "[a]ny other factors the court deems just and equitable." *See* ORS 107.105(1)(d)(A)(i) - (vii). We have previously explained that "transitional support is appropriate only where it is contemplated that a party will obtain education and/or training to facilitate reentry or advancement in the job market." *Stuart*, 259 Or App at 181 (an award of transitional support was not supported where the record lacked evidence that the wife, who already possessed significant education and training, required or intended to seek additional education or training in order to facilitate her advancement in the job market); *see also DeAngeles and DeAngeles*, 273 Or App 88, 95, 359 P3d 371 (2015) (court erred in awarding transitional support where "[t]here was no indication that [the husband] intended to return to the job market, nor any evidence that he needed training or education to do so"); *Cassezza and Cassezza*, 243 Or App 400, 406, 260 P3d 504 (2011) ("court erred in labeling any portion of the spousal support award *** as transitional support in the absence of evidence that wife intended to attain education and training necessary to allow her to prepare for reentry into the job market or for advancement therein").

However, a party's failure to evince an explicit intent to participate in further education or training is not dispositive to an award of transitional support. Our holding in *Van Riesen and Cross*, 217 Or App 611, 177 P3d 34 (2008), is instructive on that point. In that case, the husband worked for Intel for several years until he was terminated after a poor performance review. *Id.* at 613. At trial, the evidence showed that the husband was "effectively unemployable," and two experts testified that the "husband had a number of barriers making it highly unlikely that he would be able to find a job in the high-tech field," including the stigma of his termination for poor performance, his prolonged absence from the high-tech market, and his age, 56 years old. *Id.* at 615. The experts also considered whether the husband could seek further training to update his high-tech skills, but they opined that that was "not a very practical solution" because "by the time husband finished such training, he would be very close to retirement age." *Id.* The trial court awarded the husband a $25,000 lump sum for transitional support and awarded him the "long half" of the property division. *Id.* at 616. On *de novo* review, we concluded that, regardless of the cause of the husband's employment difficulties, it was clear that he was very unlikely to find employment similar to his work at Intel and recognized that it could "take some time for him to find suitable work, even at minimum wage." *Id.* at 619, 620. As such, we held that an award of transitional support was appropriate, though we reduced the amount to $15,000 to better correspond with the amount of time and resources it would take for the husband to transition into a new job. *Id.* at 620 (also awarding the husband maintenance support).

The similarities between wife's position in this case and the husband's position in *Van Riesen* support the trial court's award of transitional support in this case. As in *Van Riesen*, the vocational expert's testimony established—and husband does not contest—that wife was very unlikely to return to a position similar to the one she had held at Intel and that finding even a low-wage production job would take some time and uncompensated effort. The vocational expert recommended that wife enroll in classes and participate in volunteer work to update her skills while she looked for employment, a plan that the court noted would mean

that wife would not have any income. At trial, wife asserted a general willingness to follow the vocational expert's recommendation, and the court then ordered her to "make reasonable efforts" to that end. Under those circumstances, the court did not err in awarding transitional support.

The remaining question is whether the court abused its discretion in declining to limit the duration of wife's transitional support. After considering whether evidence in the record supports the duration of the award, *see Berg*, 250 Or App at 2, we conclude that it does not. Transitional support is typically awarded for "education or on-the-job training to prepare for reentry into the job market." *Cassezza*, 243 Or App at 404. It follows that, because that type of support is often awarded for a specific purpose, its duration must correspond with the general timeframe of that identified purpose. *See, e.g., Carlson and Carlson*, 236 Or App 291, 310, 236 P3d 810 (2010), *rev den*, 349 Or 602 (2011) ("[A]n award of $3,000 in transitional support for three years [was] appropriate to allow wife to * * * build up a design business or otherwise prepare for re-entry into the job market."); *Hook and Hook*, 238 Or App 172, 182-83, 242 P3d 697 (2010) (on *de novo* review, awarding the wife transitional support up to the estimated completion date for her master's degree); *Gillis and Gillis*, 234 Or App 50, 57, 227 P3d 809 (2010) (transitional support for three years was "necessary to allow wife to make the transition to full-time employment" in real estate). In this case, although there is some uncertainty as to when and if wife will be able to secure employment—as is often the case—the court had several markers by which to gauge an appropriate timeframe for her transition. For example, the vocational expert testified that it would take wife six to eight months to secure a low-wage, entry-level job (likely her only option), a finding that the court expressly adopted. The record also shows that the Better People program would take wife, at most, six weeks to complete. Additionally, the court found that wife could seek to expunge her criminal record starting in January 2014, at which point she could better determine the success of that strategy on her employability. Thus, the record in this case does not support an award of indefinite transitional support. *Cf. Bean and Bean*, 223 Or App 108, 112, 195 P3d 412 (2008)

(on *de novo* review, award of indefinite transitional spousal support was not appropriate where the wife expected to find full-time employment "in a few years"; award limited to a period of three years); *Van Riesen*, 217 Or App at 620 (on *de novo* review, limiting the husband's award to a specific amount where the husband's employment prospects were similarly uncertain). Accordingly, we reverse and remand that award for reconsideration.

We next consider husband's third assignment of error, in which he contends that the trial court erred in denying husband's motion to supplement the trial court record. Husband argues that the court did not have sufficient facts to conclude that the $29,000 he borrowed was his personal debt and not a marital debt. He contends that the court should have granted his motion to supplement the record, which "detailed all of the applicable facts, gave the court copies of supporting documents, and explained why the court's ruling was mistaken." Husband suggests that the supplemented record would have contained information consistent with his testimony that the money he borrowed was used to make improvements on the land, thereby contradicting the appraiser's testimony. As to why he did not supply that information during trial, husband states that he did not consider those facts significant at the time and "did not make them a focus of his trial presentation." According to husband, "[n]either side put them at issue."

Wife argues in response that the court did not abuse its discretion in denying husband the opportunity to supplement the record. She notes that the Oregon Rules of Civil Procedure do not provide for such a motion and that, in all events, the court in fact considered the materials husband submitted and made an explicit finding that the evidence did not support his allegations.

Preliminarily, we do not find any authority, nor does husband cite any, for filing a post-trial "motion to supplement the record." Presumably, allowing such a motion is within the trial court's discretion—but we cannot find an abuse of the trial court's discretion in denying husband's motion. Husband had the opportunity to cross-examine the appraiser and to introduce evidence during trial in support of

his claim that the land had been improved using funds from the line of credit. Although the parties may not have focused on that issue, the court had placed those facts at issue when it inquired why the line of credit had not decreased further despite husband's significant payments to that account. The court's denial of husband's request to further litigate that issue after the court had made findings was well within its allowable discretion.

Finally, we consider whether the court erred in its division of the marital property. ORS 107.105(1)(f) authorizes a court to provide in its judgment "[f]or the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances." It further provides, in part:

"(C) Except as provided in subparagraph (D) of this paragraph, there is a rebuttable presumption that both parties have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held.

"(D)(i) Property acquired by gift to one party during the marriage and separately held by that party on a continuing basis from the time of receipt is not subject to a presumption of equal contribution under subparagraph (C) of this paragraph.

"(ii) For purposes of this subparagraph, 'property acquired by gift' means property acquired by one party through gift, devise, bequest, operation of law, beneficiary designation or inheritance."

In *Davis and Davis*, 268 Or App 679, 681-83, 342 P3d 1117 (2015), we summarized the Supreme Court's three-step process for making a "just and proper" property division outlined in *Kunze and Kunze*, 337 Or 122, 92 P3d 100 (2004). Under the *Kunze* framework, a court must first determine whether a particular piece of property is a marital asset.[1] *Davis*, 268 Or App at 681. Second, if the property is deter-

---

[1] Marital property and marital assets have distinct legal meanings. Marital property "consists of any property that the parties possess, regardless of when it was acquired," whereas marital assets are "a subset of 'marital property' and consist[] of property acquired during the marriage." *Morton and Morton*, 252 Or App 525, 532, 287 P3d 1227 (2012).

mined to be a marital asset, then "the court must apply the presumption of equal contribution," which is a "'rebuttable presumption that both parties have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held.'" *Id.* (quoting ORS 107.105(1)(f)). If a party rebuts that presumption, "the court must decide how to distribute the martial asset without regard to any presumption and, instead, must consider only what is 'just and proper' in all the circumstances." *Id.* Typically, "[w]hen a party proves that a martial asset was acquired without any contribution from the other spouse, absent other considerations, it is 'just and proper' to award that marital asset separately to the party who has overcome the statutory presumption." *Id.* (internal quotation marks omitted). Third, once the court has reached a preliminary determination about the division of the asset in question, the court must then consider the just and proper division of *all* the marital property; that is, a court may divide any of the spouses' property, including what it has previously determined to be separate property. *Id.* at 682.

In this case, husband contends that the court erred in its property division by (1) assigning the $29,000 debt from the line of credit to husband personally, (2) treating husband's one-third interest in the 20 acres as a marital asset, and (3) awarding wife more than half of the parties' assets. With regard to the first issue, husband maintains that $20,000 of the $29,000 went to improve jointly owned property and should have been considered as a debt owed by both parties. He then argues that he should not be credited with having received the other $9,000, which he used to pay for his divorce attorneys, because wife was allowed to use $47,000 of their assets to cover her prior legal expenses and, as a matter of equity, he should not be punished for doing the same. As to the second issue, husband relies on *Kunze* to argue that, "where the presumption of equal contribution is rebutted, the separately held property presumptively goes to the property's owner, without an equalizing award to the nonowner." Husband requests a $61,300 adjustment to the property division to reflect the value of the $29,000 from the line of credit and the value of the $32,300 from husband's one-third interest in the 20 acres.

In response, wife contends that the trial court's division of the marital property was just and proper under the circumstances. Wife points out that the trial court's "discussion centered around the value that [h]usband received in being able to live rent free for as long as he wanted in the house that he and [w]ife had built, but which is owned by his mother and his mother's trust." She suggests that the court aimed to offset that value, which was not readily quantifiable, in its property division.

We begin by addressing whether the record in this case supports the court's implicit finding that the $29,000 husband borrowed via the line of credit was not a marital debt. We conclude that it does. In *Christensen and Christensen*, 253 Or App 634, 639-40, 292 P3d 568 (2012), we explained:

> "Our cases recognize a distinction between marital debts and debts that benefited only one of the parties. In determining the nature of a debt, courts 'focus not on the person in whose name the [debt was incurred], but on the use to which it was put.' *Branscomb and Branscomb*, 201 Or App 188, 202, 117 P3d 1051, *rev den*, 339 Or 544 (2005). If the debt was incurred to pay family expenses, equal division of the debt is generally appropriate. If, on the other hand, the debt is properly attributed to only one of the parties, the debt should generally remain that party's responsibility. *Id.* at 203."

In this case, only husband and Ewing were named on the line of credit, and husband admitted that he borrowed $9,000 to pay for his own attorney fees related to the dissolution proceedings. Because husband incurred the $9,000 debt for his own benefit after the parties' separation, it was appropriate for the court to find that the debt was not a marital debt and to allocate the responsibility of that debt to husband. *See Branscomb*, 201 Or App at 202 (excluding from the marital debt the wife's cash advances used to "defray her attorney bills for the dissolution action"). In addition, the court found against husband as to the use of the $20,000 based on the appraiser's testimony and the court's credibility findings against husband.[2] That evidence supports the court's finding

---

[2] As noted, the court stated that husband's testimony was guarded and expressed concern that husband had not disclosed the additional charges against

that the $20,000 was not a marital debt, and as such, it was also proper for the court to allocate that debt to husband.

Next, we address whether the court erred in treating husband's one-third interest in the 20 acres as a marital asset in its division of property. The record indicates that husband acquired that property interest with money he inherited during the marriage. Husband contends that the property should have been awarded to him separately because, under the *Kunze* analysis, he successfully rebutted the presumption of equal contribution. We note, however, that *Kunze* preceded the legislature's 2011 amendments to ORS 107.105(1)(f), which expressly created an exception to the presumption of equal contribution for property acquired by gift. *See* Or Laws 2011, ch 306, §§ 1-2 (effective January 1, 2012). We have not had occasion to consider the practical effect of that statutory change on the *Kunze* legal analysis, but we need not reach that issue in this case because, as a preliminary matter, we cannot discern whether the court properly considered the statutory exception for gifted assets. Because husband claimed that he acquired the property during the marriage using inherited funds, the court had to determine whether the property was "separately held * * * on a continuing basis from the time of receipt." ORS 107.105(1)(f)(D)(i). If it was separately held, then the property, as a matter of law, was not subject to the presumption of equal contribution. *Id.* Here, we cannot discern whether the court engaged in that analysis, as it made no relevant findings. The court simply stated, "It is just and proper to include all assets of the marital estate, therefore [husband's] 1/3 interest in [the 20 acres] is awarded to [husband] with the value of $32,300." The court did not indicate that the property was acquired with inherited funds, and it made no express findings about whether the property was separately held on a continuing basis, even though the record includes testimony as to that issue.[3] Without any evi-

---

the credit line and that he claimed the information provided by his attorney in earlier documents had not come from him. Generally, "we defer to the court's express and implied credibility findings." *See Brice v. Hrdlicka*, 227 Or App 460, 462, 206 P3d 265 (2009).

[3] We note that "[a]ppreciation during the marriage of property brought into the marriage by one spouse is also a marital asset." *Olson and Olson*, 218 Or App

dence that the court applied the required statutory consideration, we are in no position to consider whether the court abused its discretion in dividing the 20 acres in the manner in which it did. *See Fine and Fine*, 272 Or App 307, 320, 355 P3d 198 (2015) ("Because the court failed to describe the basic reasons for its denial of husband's request, *Olson and Olson*, 218 Or App 1, 15, 178 P3d 272 (2008), we are not in a position to consider whether the court 'misapplied the statutory and equitable considerations.'"); *Weems v. Winn*, 272 Or App 758, 761, 358 P3d 322 (2015) ("Because the trial court did not follow the statutory methodology when it made its custody determination, and application of that methodology on remand will require the court to make factual findings that may be dependent on the court's assessment of the parties' credibility, we decline to exercise our discretion to review the case *de novo*, and, instead, we vacate and remand.").

Transitional support award reversed and remanded; property division vacated and remanded; otherwise affirmed.

---

1, 7, 178 P3d 272 (2008) (citing *Massee and Massee*, 328 Or 195, 206, 970 P2d 1203 (1999)). Here, the court also did not distinguish between the inheritance money used to purchase the property, the actual property, and the appreciation amount.