Argued and submitted September 20, affirmed November 27, 2019

In the Matter of the Marriage of

Zoltan A. VARRO,
*Petitioner-Appellant,*
*and*

Cynthia VARRO,
*Respondent-Respondent.*

Josephine County Circuit Court
14DR09069; A166157

454 P3d 35

In this domestic relations case, husband appeals a general judgment of dissolution, an order, and two supplemental judgments. Among other rulings, husband assigns error to the trial court's award of transitional spousal support to wife and the trial court's denial of his motion to modify that award. Husband argues that modification of the award is appropriate because wife obtained employment. *Held*: The trial court did not err. With regard to the trial court's award of transitional spousal support, the trial court adequately considered the factors provided in ORS 107.105(1)(d)(A) in fashioning its award and did not abuse its discretion. With regard to the trial court's denial of husband's motion to modify the award of transitional spousal support, when the trial court made that award, it anticipated that wife would obtain employment and, consequently, wife obtaining employment was not an unanticipated change in economic circumstances.

Affirmed.

Thomas M. Hull, Judge. (Judgments)

Michael Newman, Judge. (Order)

John C. Howry argued the cause for appellant. Also on the briefs was The Law Office of John C. Howry, P. C.

Kendell H. Ferguson argued the cause for respondent. Also on the brief was Sorenson, Ransom, Ferguson & Clyde, LLP.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

In this domestic relations case, which turns on evidence presented during the dissolution proceedings concerning the nature of dental training and the business of dentistry, husband appeals a general judgment of dissolution, an order, and two supplemental judgments. Husband assigns error to, among other things, the trial court's (1) award of transitional spousal support to wife, and specifically the amount and the duration of that award; (2) denial of husband's motion for reconsideration regarding the award of transitional spousal support to wife, which husband filed after wife found employment as a dentist; and (3) denial of husband's motion to modify the award of transitional spousal support to wife, which husband argued was appropriate due to wife's employment as a dentist.[1] For the reasons that follow, we affirm.

## I.   FACTS, STANDARD OF REVIEW, AND PROCEDURAL HISTORY

Husband requests *de novo* review; however, because we do not consider this to be an exceptional case, we decline to exercise our discretion to apply such review. *See* ORS 19.415(3)(b) (we have discretion to apply *de novo* review in equitable actions); ORAP 5.40(8)(c) (stating that we will exercise our discretion to apply *de novo* review only in "exceptional cases").

Having declined husband's request for *de novo* review, "we are bound by the trial court's express and implicit factual findings if they are supported by any evidence in the record." *Stewart and Stewart*, 290 Or App 864, 866, 417 P3d 438 (2018) (internal quotation marks omitted). If the trial court did not make express findings on a particular issue in dispute, "we assume that the trial court found the facts in a manner consistent with its ultimate conclusion." *Id.* (internal quotation marks omitted). We state the facts consistently with that standard.

---

[1] Husband also assigns error to various trial court rulings concerning parenting time, custody, and attorney fees. We reject those assignments of error without discussion.

In 2003, wife graduated from dental school. In 2004, wife met husband and they married in April 2006. At that time, wife was employed full time as a dentist, and husband was completing a radiology residency at Oregon Health & Science University (OHSU) in Portland, Oregon, the city in which wife was raised, and wife's mother and stepfather reside.

During their marriage, wife discussed with husband the possibility of opening her own dental practice. During the dissolution proceedings, evidence was presented that wife wanted to open her own dental practice for several reasons, including "being successful as a dentist" and because owning a practice gives dentists an opportunity to "pick [their own] salary," insofar as they get to determine how many hours per week they work. Wife also believed that she would have greater control over her schedule if she owned a practice than if she pursued other avenues of employment in the dental field, and that would allow her to cater to her children's schedules. Additionally, wife believed that she might be able to earn more money working a few days a week in a dental practice that she owned than in a dental practice that she did not own. In short, her ideal situation would be owning her own practice.

In June 2007, a little over a year after they were married, wife and husband moved to Vacaville, California, so that husband could complete a four-year commitment to the United States Air Force (USAF). Husband made that commitment prior to beginning his residency at OHSU, because he believed that it would make him a more competitive candidate when applying for radiology residencies.

After wife and husband moved to Vacaville, wife did not immediately start working outside the home because, as husband explained during the dissolution proceedings, wife and husband had just moved and they were trying to start a family. In June 2008, wife and husband had their first child.

Beginning in January 2009, husband was deployed overseas, and wife started working as a dentist one day per week. Around June or July 2009, when husband returned from deployment, wife began working two days per week as a dentist, primarily treating pediatric patients, which

differs in many respects from treating adult patients. Wife stopped working around June 2010. In November 2010, the parties had their second child.

Around June 2011, after husband's USAF commitment ended, the parties returned to Portland so that husband could complete a one-year radiology-related fellowship at OHSU. Wife was not working outside the home during husband's fellowship in Portland.

In June or July 2012, after husband had completed his fellowship, wife and husband moved to Grants Pass, Oregon, where husband had received a job offer to work as an associate in a radiology practice. Wife and husband would have preferred to stay in Portland, but the job market for radiologists did not allow for it.

In August 2012, wife obtained employment working one day per week as a dentist in Grants Pass.[2] Wife experienced difficulty in that position. During the dissolution proceedings, wife explained that, in that position, she performed only the dental procedures that she felt she could perform without engaging in malpractice, which were "very limited," given her sporadic and limited work as a dentist following wife and husband's move to Vacaville. She also explained that she was not confident with the procedures that she was performing at that job.

In August 2013, husband became a partner at the radiology practice in Grants Pass. As a result, husband's income increased. He earned $496,266 in 2014 and approximately $542,000 in 2015.[3]

In contrast to husband's continued career success and upward advancement, in April 2014, wife's position at the dental clinic where she worked was eliminated. Wife explained during the dissolution proceedings that her position was eliminated by her employer's chief financial officer,

_____

[2] Wife increased her schedule to two days a week during a subsequent two- or three-month period.

[3] During the dissolution proceedings, husband testified that his salary in 2015 was an outlier, because it included an approximately $42,000 payment that he would not receive in future years. As noted below, however, husband's income remained significant in 2016 and 2017.

and that there was "probably a correlation" between the elimination of her position and her failure to "produce[]" at that job, and that at that job she "fell short" of the dental clinic's goals.

In December 2014, husband filed a petition for dissolution and took the position that wife should be "awarded limited and reasonable transitional spousal support." Wife, for her part, sought spousal support and asked the trial court to allow her to move to Portland.

Wife explained that she sought spousal support because she would "need help with transitioning back into [her] field" and she believed that husband had left her in a very bad position. She had, in her view, sacrificed her career for her family so that husband could build his career, but once he reached the "top of his field" and was making "over half a million a year," husband "kicked [her] to the curb." She had "stopped everything" and "followed [husband] around," trusting that husband would "be [there] for [her]," but, instead, he was not. Wife explained that she was 47 years old and was "starting from scratch."

With regard to relocating to Portland, wife believed that relocating to Portland would increase the likelihood that she would be able to "actually really make it" as a dentist.[4] During the dissolution proceedings, evidence was presented that the demographics of the Portland market would increase the likelihood of wife being able to open a successful dental practice. That is, in part, because the patient-to-dentist ratio in the Rogue Valley, where Grants Pass is located, makes it a "bad market" for someone to open a dental practice, and the demographics in Portland are "much better."[5] As a result, a dentist opening a practice in the Rogue Valley would need to spend a substantial amount of money and time marketing the practice for it to become successful.

---

[4] Wife also sought to move to Portland to be closer to her family.

[5] Specifically, evidence was presented during the dissolution proceedings that for a full-time dentist to be successful she or he needs 1500 to 1800 active patients, but the ratio of dentists to patients in the Rogue Valley is one dentist per 620 patients. Further, the "target population" for dentists in private practice is patients with an annual income of $50,000 or more, and once that is considered, the ratio in the Rogue Valley is one dentist per 220 patients.

Evidence was also presented during the dissolution proceedings that the Rogue Valley is a better market in which to purchase an existing practice than it is to open a new practice. But, while approximately 32 dental practices were for sale in Portland around the time of the dissolution proceedings, only one dental practice was for sale within a 60-mile radius of Grants Pass, and that practice was listed at $815,000. As one witness observed during the dissolution proceedings, $815,000 is "a lot of dentistry."

During the dissolution trial, the parties thoroughly litigated wife's employability and earning potential as a dentist, and presented evidence regarding various aspects of the dental industry; as is relevant to our analysis, we summarize some of the evidence below.

Husband called the manager of a vocational rehabilitation firm, Stan Potocki, who husband's attorney had been retained to "do an assessment of the employability of" wife. Potocki opined that wife was "of course" employable as a dentist, because she was licensed to practice dentistry, and that wife needed no additional training to reenter the labor market. Potocki also opined that wife could find part-time employment in three months and full-time employment in six months.

Potocki also explained that there are different niches in the labor market for dentists. Specifically, according to Potocki, dentists can (1) open their own practice and be self-employed, (2) work as an associate dentist at a private practice as, "in essence," an employee, or (3) work in the public sector at a clinic. In his view, wife would be employable in any of those scenarios, but noted that "opening a practice[] would take quite a bit more of an endeavor businesswise." Potocki also stated that public sector dentistry typically pays less than private sector dentistry.

With respect to what wife could earn as a dentist, Potocki opined that wife, working full time as an associate dentist, would have an "initial wage-earning capacity" of $145,000 in the "Southern Oregon area." He explained that "earnings for dentists are sometimes driven by production"—*i.e.*, how many patients you see per day and how many procedures you do—and that a dentist can attain higher

earnings, "in the hundred and seventy-five-thousand-dollar range *** if they're moderately productive," and "on task quite regularly."

Additionally, Potocki acknowledged that wife's skills might be "rusty" and that certain procedures might take her longer initially than they would have had she not taken time away from the practice of dentistry.

Husband also called a dentist, John Hendy, who testified that it is "pretty common" for associate dentists to make $250,000 per year, but, to do so, the "number one thing is[] efficiency." He also testified that some associate dentists make as much as $300,000 per year and that it is possible to start a dental practice and to work only two or three days per week.

Wife and wife's witnesses took a less optimistic view of wife's employability.

Wife testified that she believed that, if she applied for jobs as a dentist she could obtain employment, but she did not believe that she would be able to stay employed because her "skill level" and her "knowledge ha[d] declined," her "production was low [at her] last job," and she was not sure if she would be able to "produce" or "perform the procedures."

Additionally, wife testified that she would need at least a year, and possibly two years, of continuing education courses to practice dentistry successfully without committing malpractice, and that she needed to take a lot of continuing education courses before she could perform dentistry at a level commensurate with "today's standard of practice." The cost for such courses could be around $100,000, including travel and lodging. Wife explained that she had graduated in 2003, and that since that time there have been developments in dentistry, insofar as the technology of dentistry has changed. She had, in her view, "missed out on major concepts" since "taking time off for the children." Wife testified that she could not currently "do" "braces," "bridges and implants," "crowns and caps," "dentures" "complex [extractions]," "gum surgery," "oral cancer examinations," "root canals," "teeth whitening," "veneers," "X-rays," "laser dentistry," and had never used a "CEREC" machine. (Some capitalization omitted.).

Wife further testified that, after she completed the continuing education she required so as to not commit malpractice, she would like to buy a practice, but, if she could not buy an existing practice because she was in Grants Pass, she ideally would find a job in private practice.

Wife also called a consultant for dental businesses, Rhonda Savage, a dentist, who testified that, given wife's current skill level, wife was "unemployable." In Savage's view, wife's "skills are fillings," and Savage noted that wife does not even "feel she does those well." Savage testified that, without further training, if wife did any dental procedure other than fillings, wife would be at risk of malpractice and that, even if wife only did fillings, she might be at risk of malpractice if the quality was poor. Savage testified that based on wife's work history and "what [wife] has produced," wife did not have the skill set required to work in corporate dentistry or private practice.

Savage also opined on the difference between dentistry in a rural area and a more urban environment. She explained that, especially in rural areas, patients "like the general dentist to do as much as they can" because there are fewer specialists available, and because many patients in rural areas do not have income sufficient to pay for treatment by specialists.

Further, in Savage's view, general dentists who are "really successful" have a variety of skills and, although they "may refer core complex cases," successful general dentists are able to do "moderate to minor surgical procedures," "treat [mild to moderate] periodontal disease," and have the ability to do orthodontics. But to do those things, Savage explained, general dentists must "have the training to do [them] at the level of the specialist" or the dentist performing them is at risk of malpractice.

Savage also testified that wife needs additional training, that wife's skills would take time to develop, and that if wife is "not at the same level of knowledge as a specialist, an orthodontist, an[] endodontist, or root canal specialist, a periodontist, and she's treating these cases inappropriately, it would increase her risk of malpractice."

Savage also opined that wife was "11 years behind [the] colleagues" that wife went to dental school with, and that it would take wife "a lot of time" to develop the skills necessary to run a practice. Savage noted it would take two years to "learn not only the business side" of dentistry, but also "to present the dentistry to support [a] practice." Savage explained that for wife to successfully attract and keep patients—as is necessary for a dentist to run a successful dental practice—wife would need to "project confidence and have confidence in her skills," and that in a "private practice setting it typically takes two years before a dentist is really competent."

Savage opined that, if wife were to purchase the $815,000 practice that was for sale in the Rogue Valley, wife would "set herself up for failure and bankruptcy" because wife does not have the "skills that could support that type of production, the knowledge to diagnose, [or] the knowledge to produce the dentistry." She explained that to maintain a practice of that size, given wife's current skill level, Savage, as a consultant, "would need to almost come and live in her practice." And, Savage added that, if wife was to open her own practice at her current skill level, wife would likely "go bankrupt" and "lose some money."

Savage testified that full-time coaching would be beneficial to wife in running her own practice, which annually, for someone with wife's limited experience, would cost approximately $54,000, for a minimum of two years, and that many of Savage's clients use her as a consultant for "five or six years" after "the initial level."

Savage further opined that "[h]ands-on courses" would be very important for wife to build her skills and a "continuum of practice would be important where she would work with a mentor and review cases." She noted a person can "easily" spend "$20,000, $30,000, $40,000 on a class like that," if they own a practice, "because you have to step away from the practice." That is, there is "the actual cost of the classes, *** lost production, and *** travel time and costs that are also involved in that kind of a learning practice."

Wife also called another witness, who testified that, in her experience, public dentistry, as a "type of practice," is

typically not a "long-term thing" for dentists, in part because the procedures performed tend to be more physically taxing than those performed in private dentistry.

On January 26, 2017, the trial in the dissolution proceeding concluded. During closing argument, wife renewed her requests for permission to move to Portland and an award of spousal support. Husband argued that the court should deny wife's request to relocate to Portland and not award wife any spousal support going forward, but that, if the court was going to award transitional support, it should be for a short duration.

On March 29, 2017, the trial court issued a letter opinion addressing the multitude of issues that were litigated during the dissolution proceedings. As relevant here, the trial court denied wife's request for permission to move to Portland and ordered that wife obtain the approval of the court before moving more than 60 miles from Grants Pass. The trial court explained that it reached that determination for the following reasons:

> "The parties as well as the experts who testified in regard to custody and parenting time, both favor the parties to reside close to each other to allow for parenting exchanges often and with the most reasonable and limited amount of time consumed by exchanges/transfers. [Husband] wishes to restrict the parties to close proximity and that [wife] not move to Portland, at least not without [husband] having a comparable position and income in Portland. It is clear that [husband] is able to and he has fashioned his job's timing and days off to allow for the most flexible schedule possible to provide for limited exchange time. Living in the same location is an advantage to the children without doubt. It was clear that there was no present position available in the Portland area that would provide the same income, or the same flexibility [to husband] to facilitate parenting. He has considered Portland work and has applied but with no success.

> "It is difficult to discuss parenting and a limitation on [wife] in regard to Portland, without considering her position as a licensed dentist. Evidence was significant from [husband] with regard to the present ability of [wife] to obtain employment and to work now. [Wife] presented witnesses as well as testimony that she is

currently unable to practice dentistry at this time or without additional training and for up to two years. Her establishing a private dentist office is more difficult, would require additional investment, and more time. It is also clear that opportunities for [wife] in dentistry are more in number, and would strongly suggest that Southern Oregon would be more limited and less conducive for her success given her circumstances.

"I am inclined and do order that [wife] before moving more than 60 miles from Grants Pass, must obtain approval of the court to do so at further hearing. I conclude it is in the best interests of the children, especially at their current age, that both parties remain residing within that 60-mile radius. And this limitation applies to both parties."

The court then explained that its conclusion that wife would need to obtain the approval of the court before moving more than 60 miles from Grants Pass had an effect on "the amount and tenure of spousal support" that it intended to award to wife.[6] It explained that, because wife "is being limited from access [to] the Portland market for dentists, support should be more significant in time and amount. The location of the family, while beneficial, it has a cost to [wife] as well."

The court then explained why it was awarding transitional spousal support, but not compensatory spousal support:

"I am not awarding compensatory support as I do not find the purposes therefore a part of the facts of this case. I likewise do not find that indefinite support is appropriate. [Wife] has a license to practice dentistry. Given time she can hone her skills to become a competent dentist and develop and maintain a practice. Therefore I focus on transitional support in order for [wife] to re-engage her profession that she effectively left almost 10 years ago to have children and raise them, for the most part being a stay at home mom, and to alter her lifestyle to accommodate that profession.

---

[6] The general judgment of dissolution of marriage provides that both husband and wife "should obtain prior approval of the court before moving outside the urban growth boundary for the city of Grants Pass."

"This is not what I call a high current asset divorce however it is one of high income and a potential for conservation and accumulation of assets. While [wife's] income may become significant it will not approach [husband's] income. [Wife] has been relying in significant part or in most part upon [husband's] income, while raising the parties' two boys. She did work outside the home before the children and after the marriage, but since then, her time in gainful employment has been very limited.

"There was testimony from [husband] that both parties expected [wife] to become gainfully employed at some point. [Wife] contradicts this perspective, and she advises that there was no agreement when or if she would re-establish her practice. After birth of the children [wife] attempted to work up to 1 day a week, which employment failed and she withdrew therefrom.

"* * * * *

"The law in Oregon does not favor or expect the court to categorize marriage as long, mid or short term. The length of marriage has probably more to do with property division than support, however, it is clear the law expects a youthful party that can work or educate and support themselves to do so. Here, [wife] is 47 years of age. She has an extensive education, though she has never developed a dentistry practice and certainly so far has given up the opportunity to do so during the marriage. The court expects her to become selfsupportive over a period of time.

"Of significant importance also is the court's obligation to leave the parties with a lifestyle not over disproportionate to the lifestyle enjoyed during the marriage. While the court with all of its objectives cannot do so for the life of [wife] it is a consideration. Also overall the court [has] defined divisions of assets and support that is just and equitable, which I have attempted to do so with the consideration of a property division, and support as follows."

The trial court's letter opinion then awarded transitional spousal support as follows:

- $10,000 per month for the first two years (February 2017 through January 2019);

- $5,000 per month for the following three years (February 2019 through January 2022); and

- $2,500 per month for the following two years (February 2022 through January 2024).

In May 2017, wife signed an employment agreement to work three days per week as a dentist at a public health dental clinic, earning approximately $127,509 per year. That agreement took effect in June 2017, and wife started seeing patients in July 2017, approximately six months after the end of the trial in the dissolution proceedings.

Also in July 2017, husband filed a motion titled "Motion to Reconsider Spousal Support, Child Support, Parenting Time and Attorney Fees and Order New Evidentiary Hearing." In that motion, husband argued that wife's "lack of employment was a relevant if not one of the most important factors in the court reaching its decision on Spousal Support, Child Support, Parenting Time and payment of Attorney Fees." Husband took the position that the court should reconsider the conclusions it reached in its March 29, 2017, letter opinion, because wife "was able to find employment as a dentist within 3 months of the court's decision."

On September 29, 2017, the court issued a letter opinion denying husband's motion for reconsideration. In that letter opinion, the court explained that

"[t]he primary issues raised in the motion[—]support, custody and parenting time[—]are certainly significant, but have also been raised and thoroughly litigated multiple times. Truly the issue of [wife's] ability to earn an income and reenter dentistry practice was also thoroughly contemplated during this case and trial."

Around the same time, a draft judgment of dissolution of marriage was prepared. Husband objected to a provision of the draft judgment providing that, "[b]ecause wife is being limited from access [to] the Portland market for dentists, [transitional spousal] support should be more significant in time and amount." After considering husband's objection, in a July 14, 2017, letter opinion, the trial court denied husband's request to remove that language,

explaining that wife's limited access to the Portland market was relevant to its award of transitional spousal support because it impacted "how long it may take [wife] to establish herself as a dentist and with a private practice." The court also noted that as "a result of the children [wife] worked less, gave up the opportunity to become an established dentist or develop her own private practice."

On October 9, 2017, husband filed a motion to show cause seeking to, among other things, terminate or reduce husband's "spousal support obligation due to the change in [wife's] income." At a March 19, 2018, evidentiary hearing concerning that motion, husband argued that the "basis for the modification is that [wife] now has employment" and "a substantial income," which is a "change from the time of the trial and that qualifies for a change in circumstance."

Additionally, at that evidentiary hearing, wife testified that, although she was employed as a dentist, her skills remained limited and she needed "a lot" more continuing education to be able to do "everything a regular dentist would do." She also explained that at work she was doing "just really simple stuff," like "simple filings" and "[s]imple extractions," but even with respect to extractions, she was "probably the weakest of all the dentists" in the clinic where she worked. Wife also testified that she was unable to do all of the procedures offered by the clinic where she worked.

Additionally, wife testified that, since the trial, she had taken continuing education courses and was working to develop the skills that she needed to work as a dentist in the public sector. She explained that she needed fewer continuing education courses to start practicing in the public sector than in the private sector. She also testified that the majority of dentists own a practice, and with regard to the cost of continuing education for dentists, that it can cost "$15,000 to $20,000 just to learn how to do an implant" and "everybody is doing implants nowadays."

Husband provided testimony reflecting that his income in 2016 was $536,417 and in 2017 it was $580,270.

In a May 7, 2018, letter opinion, the trial court denied husband's motion to modify the transitional spousal

support award. The trial court explained its reasoning as follows:

"It is evident that [wife] has taken employment, that is, public employment as opposed to her own private office, as a dentist. She is earning approximately $120,000 per year, having begun employment in July of 2017. [Husband] has moved to amend the terms of the judgment regarding spousal support. I have previously noted at trial and hearing also, support for [wife] was established with a view to the future, and with the assumption that [wife] would find work, and frankly, if she did not, the judgment intentionally provided a means for [wife] to become adequately trained/refreshed in her dentistry skills to enable her, at her choice to become employed or begin her own private practice. In all circumstances the choice was hers, but she was given a limited amount of resources and time to reach an employable point. This was based upon consideration of the future as to availability for employment, training, education and the like. The judgment was clearly reached from that standpoint and point of view.

"[Husband's] position is that she is now employed as anticipated and that support should be ended. Case law requires that a change in economic circumstances must not have been contemplated at the time of judgment. I point out that [wife] is in a limited practice and that she still is in need of additional training, which training and time was anticipated in the judgment * * *. There was no set time for [wife] to become employed and the judgment was entered in order to encourage her to become trained and selfsufficient. Presumably, [husband] would have moved to end support at any time [wife] got a job, no matter when employed or what job. There was certainly no expectation in the judgment that support would end as soon as she did find or accept a position, as the judgment could have easily said same if that was my conclusion and intention. This is a case where the future for [wife] was completely and sufficiently litigated. Nothing was left out or to speculation. There has been no change in circumstances to warrant a change in support.

"That being the case, I find no evidence to suggest the judgment did not cover the situation of [wife] gaining employment and at any time. And certainly the level of income and more than [wife] is currently earning was

anticipated in the evidence at trial. There is no suggestion of fraud or untoward conduct on [wife's] part.

"The motion to change support is denied and the judgment stands."

## II.  ANALYSIS

A.  *The Trial Court's Award of Transitional Spousal Support*

Under ORS 107.105(1)(d), when a trial court renders a judgment of marital dissolution, the court may provide in the judgment for spousal support in "an amount of money [and] for a period of time as may be just and equitable." As relevant here, pursuant to ORS 107.105(1)(d)(A), a trial court in a dissolution action may order

"[t]ransitional spousal support as needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein. The factors to be considered by the court in awarding transitional spousal support include but are not limited to:

"(i)    The duration of the marriage;

"(ii)   A party's training and employment skills;

"(iii)  A party's work experience;

"(iv)   The financial needs and resources of each party;

"(v)    The tax consequences to each party;

"(vi)   A party's custodial and child support responsibilities; and

"(vii)  Any other factors the court deems just and equitable."

We have stated that "[t]ransitional spousal support is typically awarded when one spouse has been out of the workforce for an extended period of time and needs education or on-the-job training to prepare for reentry into the job market." *Stuart and Ely*, 259 Or App 175, 181, 313 P3d 317 (2013) (internal quotation marks omitted). "The wording of ORS 107.105(1)(d)(A) limits the purposes for which transitional support may be awarded to those needed for a party to attain education and training for job market reentry or advancement." *Id.* (internal quotation marks and brackets

omitted). "In other words, transitional support is appropriate only where it is contemplated that a party will obtain education and/or training to facilitate reentry or advancement in the job market." *Id*.

   The court's determination regarding "what amount and duration of support is just and equitable is discretionary and we, accordingly, review for abuse of discretion." *Id*. at 180 (internal quotation marks omitted). We will not "disturb the trial court's discretionary determination unless the trial court misapplied the statutory and equitable considerations required by ORS 107.105." *Logan and Logan*, 270 Or App 176, 183, 347 P3d 337, *rev den*, 357 Or 550 (2015) (internal quotation marks omitted). "The general rule is that the amount of a support award is not justified if it is outside the range of reasonableness by a significant enough margin so as not to be just and equitable in the totality of pertinent circumstances." *Boatfield and Boatfield*, 297 Or App 716, 720, 447 P3d 35 (2019) (internal quotation marks omitted). Further, there must be some "nexus" between the duration of the award of transitional spousal support and the time needed for reentry or advancement in the job market. *Id*. at 723 (remanding for trial court to "consider the appropriate factors and make an appropriate record" where "nothing in the record provide[d] an evidentiary basis for a nexus between the duration of transitional support ordered (12 years) and the two and a half years that wife testified it will take her to retrain"); *see also Johnson and Johnson*, 277 Or App 1, 11, 370 P3d 526 (2016) (trial court erred in awarding indefinite transitional spousal support to wife where that award was unmoored from the "markers" that the trial court had from which to gauge an appropriate timeframe for wife to transition back to employment).

   In our review, we "take seriously our practice of not micro-managing trial court decisions that disentangle the economic affairs of divorcing spouses, unless we can meaningfully improve on such decisions." *Cullen and Cullen*, 223 Or App 183, 190, 194 P3d 866 (2008) (internal quotation marks and brackets omitted). "Recognizing that a marital dissolution involves the calibration of multiple socio-economic objectives with respect to which trial courts have

a range of reasonable discretion to fashion an equitable outcome, we assume that there often can be more than one overall economic solution that would withstand an appeal from a dissolution judgment." *Id.* (internal quotation marks and citation omitted). "This jurisprudential approach serves both as an invitation to principled arguments and a statement of self-restraint in favor of stability." *Id.* "Our role *** is not to make our own determination of the 'just and equitable' amount of spousal support." *Morgan and Morgan*, 269 Or App 156, 166, 344 P3d 81, *rev den*, 357 Or 595 (2015).

In this case, we conclude that the trial court's award falls within "the range of discretion accorded by the statutory scheme." *Logan*, 270 Or App at 184. As noted above, we will not "disturb the trial court's discretionary determination unless the trial court misapplied the statutory and equitable considerations required by ORS 107.105." *Id.* at 183. In this case, it is apparent from the trial court's March 29, 2017, letter opinion, that it adequately considered, among other factors, wife's training and employment skills (*e.g.*, wife "has a license to practice dentistry," but her most recent effort at employment had "failed" and she had not yet "hone[d] her skills to become a competent dentist"), wife's work experience (*e.g.*, wife "effectively left" the practice of dentistry "almost 10 years ago"), the financial needs and resources of each party (*e.g.*, "[w]hile [wife's] income may become significant it will not approach [husband's] income"), and equitable considerations (*e.g.*, wife gave up the opportunity to develop a dentistry practice during the parties marriage and wife was being limited from access to the Portland market for dentists, in part due to husband's employment success in Grants Pass). Accordingly, we will not disturb the trial court's discretionary determination. *See id.* at 184 (affirming "generous" award of transitional and maintenance spousal support where the trial court's ruling demonstrated consideration of the statutory factors listed in ORS 107.105(1)(d)(A) and (C)); *cf. DeAngeles and DeAngeles*, 273 Or App 88, 95, 359 P3d 371 (2015) (the trial court "committed legal error" in awarding transitional spousal support where it "did not make any findings to support a transitional support award, nor was there evidence in the record to support such an award").

Further, given the evidence presented to the trial court regarding the significant cost associated with the training and continuing education needed for wife to successfully reenter and *advance* in the field of dentistry, the amount of transitional spousal support awarded in this case was not "outside the range of reasonableness by a significant enough margin so as not to be just and equitable in the totality of pertinent circumstances." *Boatfield*, 297 Or App at 720 (internal quotation marks omitted). In that regard, we observe that wife was not awarded any other form of spousal support, that there is a "rather substantial" disparity in earning capacity between the parties, and, as the trial court stated, that this was not a "high current asset divorce" but one of "high income." *See Carlson and Carlson*, 236 Or App 291, 309, 236 P3d 810 (2010), *rev den*, 349 Or 602 (2011) (noting that, in awarding spousal support, "the court must consider the other financial provisions of the judgment, and none can be considered in isolation"); *Bean and Bean*, 223 Or App 108, 112, 195 P3d 412 (2008) (noting a "rather substantial" earning disparity during "transitional period" in determining "appropriate" award of transitional spousal support).

We also note that there is some nexus between the duration of the transitional spousal support awarded by the trial court in this case, seven years, and the evidence that was presented at trial concerning the time it would take wife to successfully re-enter and advance in the dental field: Savage opined (1) that wife was 11 years behind her colleagues, (2) that if wife was to open or purchase a practice, professional coaching by a consultant would help to facilitate wife's success, and (3) that that coaching would take two years at a minimum, but many clients use her services for "five or six years" after "the initial level."[7] *See Bean*, 223 Or App at 111-12 (concluding transitional spousal support for a period of "three years from the date of the original dissolution judgment is appropriate" where wife testified that

---

[7] We note that wife's need for additional training distinguishes this case from *Stuart*, where we concluded an award of transitional spousal support to wife was inappropriate where wife needed time to "continue her professional development and build[] experience," but there was not evidence that wife "require[d] or intend[ed] to seek additional education or training in order to facilitate her advancement in the job market." 259 Or App at 182.

she expected to find full-time employment "within the next two years").

Husband argues, among other points, that the trial court abused its discretion regarding the amount and duration of spousal support in this case, because wife is capable of being "self-supporting" and does not "require further education or training." We recognize that much of the evidence presented at trial—including wife's own testimony—indicated that wife would be able to attain employment as a dentist. But the evidence also raised significant questions regarding whether wife would be able to keep that employment, at least without significant additional training and education: As the trial court found in its March 29, 2017, letter opinion, wife's prior employment in Grants Pass had "failed." As a result, it is not clear that wife—at least without significant additional training and education—is "self-supporting," as husband argues.

Moreover, husband points to no authority that awards of transitional spousal support are inappropriate merely because a party is capable of obtaining employment. To the contrary, ORS 107.105(1)(d) expressly allows for awards of spousal support as are "just and equitable" to allow for a party's "advancement" in the job market. The record contains evidence that, for wife to advance in the dental field—indeed, to merely do "everything a regular dentist would do"—wife would need certain training and education, and would need to expend substantial sums of money to obtain such training and education.

Husband also argues that wife does not "need to open her own practice or purchase an existing practice in order to support herself." The trial court's March 29, 2017 and July 14, 2017, letter opinions do suggest that the trial court, in fashioning its award of spousal support, considered what it would take for wife to establish a dental practice. In that regard, we note that the record contains evidence from which the trial court could determine that opening or purchasing a dental practice, at least for wife in the particular circumstances presented in this case, would be "advancement" in the field of dentistry: Wife testified that she might earn more money working a few days per week in a practice

that she owned than in a practice owned by someone else; that owning a practice would allow her to "pick" her salary insofar as she could determine how many hours per week she wanted to work; and that owning a practice would provide her a more flexible schedule, which would allow her to cater to her children's schedules.

In sum, we conclude the trial court did not abuse its discretion when awarding transitional spousal support in this case.[8]

B.  *The Trial Court's Denial of Husband's Motion to Modify the Award of Transitional Spousal Support*

As stated above, husband also assigns error to the trial court's denial of his motion to modify the award of transitional spousal support. Husband argues that wife's employment "qualifies as a substantial change in economic circumstances for the purposes of modifying the Transitional Spousal Support." Husband also contends that, because the "statutory purpose of the Transitional Spousal Support has been met, the Court of Appeals should terminate the spousal support as a matter of law."

Under ORS 107.135(3)(a), a court "may set aside or modify a spousal support award if there has been a substantial change in economic circumstances sufficient to justify the court's reconsideration of the award." *Luty and Luty*, 245 Or App 393, 399, 263 P3d 1067 (2011). The "substantial change in economic circumstances," however, "must have been unanticipated when the court entered the last relevant judgment in the dissolution proceeding." *Id.* at 399-400.

Whether there has been a "substantial change in [the] economic circumstances of a party sufficient to warrant reconsideration of an award of spousal support under

---

[8] As noted above, husband also assigns error to the trial court's denial of his motion for reconsideration regarding the award of transitional spousal support. That assignment of error is resolved by our discussion of the trial court's award of transitional spousal support and the resulting judgment. In any event, we conclude the trial court did not abuse its discretion in adhering to its award of transitional spousal support after husband filed his motion for reconsideration. *See Lang v. Rogue Valley Medical Center*, 361 Or 487, 497 n 8, 395 P3d 563 (2017) (considering whether "the trial court abused its discretion in adhering on reconsideration" to an earlier ruling).

ORS 107.135(3)(a) presents a mixed question of fact and law." *Tilson and Tilson*, 260 Or App 427, 431, 317 P3d 391 (2013) (internal quotation marks omitted). "We review the trial court's implicit and explicit findings of historical fact regarding the parties' economic circumstances to determine whether those findings are supported by any evidence in the record." *Id.* "We review the court's determination [of whether] those facts constitute a 'substantial change in economic circumstance of a party' under ORS 107.135(3)(a) for legal error." *Id.* at 431-32.

In this case, we conclude that the trial court did not err when it determined in its May 7, 2018, letter opinion, that there had been "no change in circumstances to warrant a change in [spousal] support." A party's income from employment is not an "unanticipated" change in economic circumstances where a trial court anticipated such employment and income when making the award of spousal support. *Bliven and Bliven*, 106 Or App 93, 96 n 1, 806 P2d 177 (1991) ("[W]e conclude that her obtaining employment was anticipated and that her earnings from that employment do not constitute an unanticipated change."). As indicated in the trial court's May 7, 2018, letter opinion, when making the transitional spousal support award in this case, the trial court anticipated that wife would find employment and, further, the level of income wife is earning (and more) was anticipated in the evidence that was introduced at trial. As the trial court observed in its September 29, 2017, letter opinion, wife's "ability to earn an income and reenter dentistry practice was * * * thoroughly contemplated."

Nor do we agree with husband that the "statutory purpose of the Transitional Spousal Support has been met." Wife's testimony during the hearing on husband's motion to modify the transitional spousal support award supports the trial court's determination that wife "is in a limited practice and that she still is in need of additional training." We also note that the record contains evidence from which the trial court could determine that wife still had room to "advance" in the dental field: Wife was employed in public dentistry, but evidence was presented that public dentistry typically pays less than private dentistry, is typically not a "long-term thing" for dentists, and that, without additional training and

education, wife does not have the skills to transition into private dentistry. Further, one of husband's witnesses, Hendy, testified that it was "pretty common" for associate dentists to earn more than wife was earning.[9]

In sum, we conclude that the trial court did not err when it determined in its May 7, 2018, letter opinion, that there had been "no change in circumstances to warrant a change in [spousal] support."

Affirmed.

---

[9] On appeal, husband does not argue that wife initially finding employment in public dentistry rather than immediately opening or purchasing her own dental practice is relevant to our analysis. We note, however, that wife needed fewer continuing education courses to start practicing in the public sector than the private sector—making her decision to start there understandable. Further, as noted above, evidence was presented during the dissolution proceeding that public-sector dentistry is typically not a "long-term thing" for dentists.